Henry PADGETT et al., Plaintiffs,

v.

Charles A. STEIN, Jr., et al.,
Defendants.

No. 72–487 Civil.

United States District Court,
M. D. Pennsylvania.

Dec. 16, 1975.

Alan Linder, Jeffry L. Gilbert, Central Pennsylvania Legal Services, York, Pa., for plaintiffs.

Gordon A. Roe, York County Solicitor, York, Pa., for defendants.

**SHERIDAN, Chief Judge.**

This case is before the court on plaintiffs' motion for enforcement of the consent decree entered into by the parties and approved by the court on May 31, 1973.

■ Plaintiffs—Henry Padgett, Eugene Washington, and William Johnson, inmates at the York County Prison—on behalf of themselves and all other inmates incarcerated at the York County Prison brought this action under the Civil Rights Act, 42 U.S.C.A. §§ 1981, 1983 and the Federal Declaratory Judgment Act, 28 U.S.C.A. §§ 2201, 2202, seeking declaratory and injunctive relief against the defendants—the members of the York County Prison Board,[1] Richard J. Hahn, Warden of the York County Prison, William B. Robinson, Commissioner of the Pennsylvania Bureau of Correction,[2] Joseph A. Fecunda, Director of County Correctional Services, Robert P. Kane, Attorney General of Pennsylvania,[3] and the Pennsylvania Department of Justice.[4] Jurisdiction is properly predicated on 28 U.S.C.A. § 1343. The complaint seeks declaratory and injunctive relief to remedy alleged unconstitutional conditions of confinement at the York County Prison. The parties entered into a consent decree, which was approved by the court, in which the defendants agreed with respect to the York County Prison: (1) to comply with the state minimum requirements for county prisons embodied in 37 Pa.Code §§ 95.221–95.248 (adopted April 6, 1973); (2) not to discriminate on the basis of race, color, religion, creed or national origin with respect to work assignments and not to permit derogatory discriminatory remarks to be made to inmates by correctional personnel; and (3) to permit all inmates visitation of at least ninety minutes per week and visitation with children of at least thirty minutes on Sundays, to allow each inmate a visiting list of eight persons, to guarantee the inmates the right to have one visitor remain for as long as ninety minutes on visiting day, in satisfaction of his weekly visitation allowance, and to modify the visitation facilities to insure more dignity and privacy for visitation.

Plaintiffs contend that the consent decree has not been fully implemented in that the conditions at and the mode of operation of the county prison violate numerous provisions of the state minimum standards for county jails and that

1. In accordance with 61 P.S. § 408, the York County Prison Board, charged with the government and management of the county jail, consists of the following members: the judges of the Court of Common Pleas, the district attorney, the sheriff, the controller, and the county commissioners.

2. Allyn R. Sielaff is no longer Commissioner of the Pennsylvania Bureau of Correction. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, his successor, William B. Robinson, is automatically substituted as a defendant.

3. Israel Packel is no longer Attorney General of Pennsylvania. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, his successor, Robert P. Kane, is automatically substituted as a defendant. .

4. The Department of Justice is not a "person" within the meaning of 42 U.S.C.A. § 1983 and therefore is not subject to suit under the Civil Rights Act. *City of Kenosha v. Bruno*, 1973, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109; *Monroe v. Pape*, 1961, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492; *United States ex rel. Gittlemacker v. County of Philadelphia*, 3 Cir. 1969, 413 F.2d 84, *cert. denied*, 1970, 396 U.S. 1046, 90 S.Ct. 696, 24 L.Ed.2d 691. *Bykofsky v. Borough of Middletown*, M.D.Pa.1975, 389 F.Supp. 836, 841.

the requirements set forth in the consent decree with respect to visitation have not been complied with. There is no allegation that the defendants have violated the consent decree's prohibition on discrimination and derogatory remarks.

■■ The court turns first to defendants' contention that plaintiffs' action for enforcement of the consent decree is barred by laches. Plaintiffs argue that the defendants have waived this defense under Rule 12 of the Federal Rules of Civil Procedure because laches was never asserted as a defense in a responsive pleading or motion by the defendants. Ordinarily, an affirmative defense such as laches is deemed waived if not asserted in a responsive pleading or motion, although the courts have freely granted leave to amend pleadings to include a defense omitted from the original pleading and have often granted relief from waiver under Rule 60(b) or Rule 15(b) of the Federal Rules of Civil Procedure. *See* 2A Moore, Federal Practice ¶ 12.23. In the instant case, the court holds that there has been no waiver of the defense of laches since one does not plead in response to a motion for enforcement of a consent decree, and where no pleading is required or permitted, there is no waiver.

■ Laches consists of two elements, unreasonable delay in asserting a claim *and* prejudice resulting to the defendant from such delay. *Gruca v. United States Steel Corporation*, 3 Cir. 1974, 495 F.2d 1252; *see Gardner v. Panama Railroad Co.*, 1951, 342 U.S. 29, 72 S.Ct. 12, 96 L.Ed. 31; *Czaplicki v. The Hoegh Silvercloud*, 1956, 351 U.S. 525, 76 S.Ct. 946, 100 L.Ed. 1387; *Gutierrez v. Waterman Steamship Corp.*, 1963, 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297. The consent decree was approved by the court on May 31, 1973. The motion for enforcement of the consent decree was filed on March 13, 1975. During this period of time defendants undertook to implement the consent decree, and plaintiffs monitored the defendants' activity and attempted to secure full compliance with the agreement. The consent decree provides that this court retains jurisdiction for the purpose of overseeing implementation of the consent decree and until such time as the court determines that the parties are in full compliance therewith. In a letter received by the court on March 12, 1975, the defendants *for the first time* requested the court to issue an order which declared them to be in compliance with the consent decree. *One day later* the plaintiffs filed their motion for enforcement of the consent decree. Thus, it is apparent that until March of 1975, defendants were still making changes in the prison in order to achieve full compliance with the agreement, and that plaintiffs were monitoring the actions of the defendants to determine whether any additional legal action on their part would be necessary. The one-year and ten month time period between the approval of the consent decree and the filing of plaintiffs' motion for enforcement thereof is not an unreasonable length of time given the nature of the consent decree and in view of the aforementioned circumstances. There has been no inexcusable delay in seeking enforcement of the agreement, and no real prejudice to the defendants has ensued from the passage of time. Plaintiffs' motion is timely, and the court holds that the motion is not barred by laches.

■■ The defendants also argue that this court should refuse to decide any questions of local and state law—e. g., whether the defendants have complied with the state minimum requirements for county prisons—because this action was brought under the Civil Rights Act, 42 U.S.C.A. §§ 1981, 1983, and, therefore, the court has the power to adjudicate only federal questions. While this argument would be meritorious in the absence of the consent decree—it being a well-established principle that wrongdoing must amount to a deprivation of a right, privilege or immunity protected by the Constitution or the laws of the United States in order to present a claim cognizable under the Civil Rights Act, *Gittlemacker v. Prasse*, 3 Cir. 1970, 428

F.2d 1; *Howell v. Cataldi*, 3 Cir. 1972, 464 F.2d 272; *Johnson v. Glick*, 2 Cir. 1973, 481 F.2d 1028; *Isenberg v. Prasse*, 3 Cir. 1970, 433 F.2d 449; *Kent v. Prasse*, 3 Cir. 1967, 385 F.2d 406; *Kao v. Red Lion Municipal Authority*, M.D.Pa. 1974, 381 F.Supp. 1163; *Conner v. Jeffes*, M.D.Pa.1975, 67 F.R.D. 86; *Sheffey v. Greer*, E.D.Ill.1975, 391 F.Supp. 1044— this contention is frivolous in the instant case where the defendants entered into a consent decree which requires them to bring the York County Prison into compliance with the state minimum standards for county jails. This court has the power to adjudicate all issues necessary to a determination of whether the defendants are in compliance with the consent decree, even though this determination requires the resolution of state law questions.

The court will examine first plaintiffs' federal constitutional claims. Plaintiffs contend that the overall conditions of confinement at the York County Prison constitute cruel and unusual punishment for both sentenced prisoners and pretrial detainees.

■ The cruel and unusual punishment clause of the eighth amendment is applicable to the states through the due process clause of the fourteenth amendment. *Robinson v. State of California*, 1962, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758. The eighth amendment's proscription is not precisely definable. In *Anderson v. Nosser*, 5 Cir. 1971, 438 F.2d 183, 190–191, the Court of Appeals for the Fifth Circuit stated:

"The cruel and unusual punishment clause is a nonstatic, moral precept designed to curb treatment which offends contemporary standards of decency. Until the early part of this century, the ban on cruel and unusual punishment had been interpreted to apply only to outrageous and barbarous practices. *See Generally* Goldberg & Dershowitz, Declaring the Death Penalty Unconstitutional, 83 Harv.L.Rev. 1773 (1970); Note, The Cruel and Unusual Punishment Clause and the Substantive Criminal Law, 79

Harv.L.Rev. 635 (1966). The concept has now expanded, but its precise boundaries are still unclear. *Wilkerson v. Utah*, 1878, 99 U.S. 130, 135–136, 25 L.Ed. 345 ('Difficulty would attend the effort to define with exactness the extent of the constitutional provision which provides that cruel and unusual punishment shall not be inflicted. * * *'); *Trop v. Dulles*, 1958, 356. U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630. Courts have relied upon such imprecise measures as the protection of 'the dignity of man,' *Trop v. Dulles, supra,* 356 U.S. at 100, 78 S.Ct. 590, or 'developing concepts of elemental decency,' *Jordan v. Fitzharris, supra* [D.C.], 257 F.Supp. [674] at 679. . . ."

In an attempt to elucidate the meaning of the concept, Justice (then Judge) Blackmun in *Jackson v. Bishop*, 8 Cir. 1968, 404 F.2d 571, 579 stated:

". . . The Eighth Amendment's basic concept 'is nothing less than the dignity of man' and assures that a state's punishment power 'be exercised within the limits of civilized standards.' Fines, imprisonment, and even execution may be imposed 'but any technique outside the bounds of these traditional penalties is constitutionally suspect.' 356 U.S. at 100, 78 S.Ct. at 598. The scope of the Amendment is not 'static.' It 'must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.' 356 U.S. at 102, 78 S.Ct. at 598. Virtually all the world's civilized nations refuse to impose statelessness as punishment for crime. 356 U.S. at 102, 78 S.Ct. at 598.

"From that opinion we glean a recognition of, and a reliance in part upon, attitudes of contemporary society and comparative law. And the emphasis is on man's basic dignity, on civilized precepts, and on flexibility and improvement in standards of decency as society progresses and matures. Finally, it is 'any technique' outside the traditional bounds which 'is constitutionally suspect.' "

While difficulty necessarily attends any effort to precisely define the term "cruel and unusual punishment," the following basic tests, each of which constitutes a different constitutional prohibition, have been utilized to determine whether particular conduct or conditions constitute a violation of the eighth amendment: (1) whether the conduct is of such a character as to violate fundamental fairness or as to shock the conscience as measured by the evolving standards of contemporary society, *Trop v. Dulles*, 1958, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630; *Howell v. Cataldi*, 3 Cir. 1972, 464 F.2d 272; (2) whether the punishment is greatly disproportionate to the offense for which it is imposed, *Weems v. United States*, 1910, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed.2d 793; *Robinson v. California*, 1962, 370 U.S. 660, 668–678, 82 S.Ct. 1417, 8 L.Ed.2d 758 (Douglas, J. concurring); *Rinehart v. Brewer*, S.D.Iowa 1973, 360 F.Supp. 105, aff'd 8 Cir. 1974, 491 F.2d 705; (3) whether the punishment goes beyond legitimate penal objectives—i. e., whether the punishment bears a rational relationship to the accomplishment of legitimate penal goals which are of sufficient importance to justify its severity, *Furman v. Georgia*, 1972, 408 U.S. 238, 257–306, 92 S.Ct. 2726, 33 L.Ed.2d 346 (Brennan, J. concurring); *Rudolph v. Alabama*, 1963, 375 U.S. 889, 891, 84 S.Ct. 155, 11 L.Ed.2d 119 (Goldberg, J., dissenting from denial of certiorari); *contra: Furman v. Georgia, supra*, at 375–405, 92 S.Ct. 2726 (Burger, C. J., dissenting); (4) whether a "unique" punishment is applied "wantonly" and "freakishly" so that it is inflicted arbitrarily on some individuals but not on others similarly situated, *Furman v. Georgia*, 1972, 408 U.S. 238, 306–310, 92 S.Ct. 2726, 33 L.Ed.2d 346 (Stewart, J., concurring).

Applying these principles to the evidence adduced at the trial in the instant case, it is readily apparent that no single prison condition at York County Prison constitutes cruel and unusual punishment. Thus, the issue becomes whether cruel and unusual punishment attends the *overall* confinement of inmates within the prison.

Several courts have concluded that inmates have suffered cruel and unusual punishment as the result of exposure to the *cumulative effect* of prison conditions, even though the conditions, examined separately, would not violate the eighth amendment. *Jones v. Wittenberg*, N.D.Ohio 1971, 323 F.Supp. 93 and 330 F.Supp. 707, aff'd sub nom., *Jones v. Metzger*, 6 Cir. 1972, 456 F.2d 854; *Holt v. Sarver*, E.D.Ark.1970, 309 F.Supp. 362, aff'd 8 Cir. 1971, 442 F.2d 304; *Hamilton v. Schiro*, E.D.La.1970, 338 F.Supp. 1016; *Brenneman v. Madigan*, N.D.Calif.1972, 343 F.Supp. 128; *Rhem v. Malcolm*, S.D. N.Y.1974, 371 F.Supp. 594, aff'd in part, rev'd in part and remanded, 2 Cir. 1974, 507 F.2d 333, opinion on remand, S.D.N. Y.1975, 389 F.Supp. 964. The court holds that the conditions which exist at the York County Prison are not shocking to the conscience and do not violate basic standards of elemental decency. Unlike the conditions found to exist in the prisons involved in the foregoing cases in which the courts held that the cumulative effect of imprisonment therein constituted cruel and unusual punishment, the York County Prison is not filthy, is free from foul odors, has adequate ventilation, heating, plumbing, lighting, and sanitation, and is not infested with rats, roaches, insects, or other vermin. York County inmates are given nutritional meals which are prepared and served in a sanitary manner (the Warden and correctional personnel eat the same food as the inmates); they are provided with adequate clothing, bedding, shaving implements (three times a week and on special occasions, such as court appearances), and cleansing devices with which to keep their cells clean (upon request). The inmates can shower daily and are allowed adequate exercise, recreation, and visitation. The prison provides satisfactory medical and dental care for inmates. Corporal punishment is prohibited. Inmates are not subject to constant attack by other inmates, and prisoners who constitute a threat to the safety of others

are segregated from the general population. The prison does not employ a trusty system. The aforementioned conditions have been found to exist in those cases, previously cited, in which the court found that the overall effect of confinement subjected the inmates to cruel and unusual punishment.

The York County Prison is overcrowded and understaffed (see section *infra* discussing state minimum requirements for county prisons) and the building itself is antiquated with no master locking system and no fire escapes. However, while the physical facility is inadequate, conditions at the prison clearly do not violate basic standards of human decency and are not shocking to the conscience. Inmates are not mistreated by the correctional staff. The court finds that the procedures set forth in the Procedures Manual (defendants' Exhibit No. 4) are in fact adhered to by the correctional staff and that the prison rules set forth in the Handbook For Inmates (defendants' Exhibit No. 3), copies of which are available to all prisoners, are in fact the rules which the inmates are subject to. The correctional personnel operate the prison in a professional manner. The court holds that conditions of confinement at the York County Prison are not shocking or barbarous and hence do not subject inmates to cruel and unusual punishment.

██ In addition, while the court agrees with the Court of Appeals for the Tenth Circuit in *Poindexter v. Woodson*, 10 Cir. 1975, 510 F.2d 464, that the use of "strip cells" as described therein is unconstitutional, it is clear that no such cells exist at the York County Prison.

Furthermore, it is apparent that the York County Prison does not inflict punishment on inmates, for misconduct or any other reason, that is disproportionate to the offense for which it is imposed, nor does the punishment go beyond legitimate penal goals. There is no corporal punishment within the prison. Indeed, the usual punishment for any mis-

conduct is loss of recreation privileges for a short period of time—i. e., a week or ten days. In addition, an inmate may be put on the "segregation tier,"[5] which because of crowded conditions at the prison does not truly constitute segregation since there are almost always many other inmates incarcerated there, including those in transit, with whom an inmate has daily contact. The physical facilities on the segregation tier and in the segregation cells are identical with those in any other part of the prison. There is no fixed segregation tier and, depending on the needs of the prison, what serves as the segregation tier one day may house inmates in the general population the next day, with a different area designated for use as the segregation tier.

Punishment for misconduct is not imposed arbitrarily or capriciously. An inmate is given a disciplinary hearing that fully comports with the procedural due process requirements established in *Wolff v. McDonnell*, 1974, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935. Advance written notice of the charges are given to the inmate no less than 24 hours before his appearance before the disciplinary committee. The inmate is allowed to call witnesses and present documentary evidence in his defense when doing so will not jeopardize institutional safety or correctional goals. The disciplinary committee, which has no member who was directly involved with the misconduct, provides a written statement as to the evidence relied on and the reasons for the disciplinary action. The hearing precedes the disciplinary action, except when immediate action is needed to protect institutional safety, to preserve internal order, or to protect others from the inmate. For example, the hearing may follow a transfer to segregation when the inmate has attempted or threatened to harm a staff member or other inmate, *see Gray v. Creamer*, 3 Cir. 1972, 465 F.2d 179, 185; *Braxton v. Carlson*, 3 Cir. 1973, 483 F.2d 933; *Rinehart*

---

5. Each floor of the prison with cells consists of four tiers, with each tier consisting of a row of seven cells. A doorway separates each tier.

*v. Brewer*, S.D.Iowa 1973, 360 F.Supp. 105, *aff'd* 8 Cir. 1974, 491 F.2d 705.

While the inmate population at York County Prison is in constant flux, at any given time more than half of the prisoners are pretrial detainees. Plaintiffs argue that the conditions of confinement and concomitant restrictions which pretrial detainees are subjected to at the county prison are constitutionally impermissible.

▇▇ Pretrial detainees do not stand on the same footing as convicted inmates. For the latter, punishment—both for purposes of deterrence and retribution—and rehabilitation are appropriate adjuncts of imprisonment, and the courts will not interfere with reasonable means adopted to achieve these goals. In contrast, the pretrial detainee is presumed innocent until proven guilty and is not to be punished or subjected to rehabilitation before he is tried and convicted of a crime. Hence, the only constitutional purpose of incarceration for the pretrial detainee is the detention itself; the pretrial detainee should not be subject to punitive conditions nor forced to participate in rehabilitative programs. *See Detainees of the Brooklyn House of Detention for Men v. Malcolm*, 2 Cir. 1975, 520 F.2d 392; *Rhem v. Malcolm*, S.D.N.Y.1974, 371 F.Supp. 594, *aff'd in part, rev'd in part, and remanded*, 2 Cir. 1974, 507 F.2d 333, *opinion on remand*, S.D.N.Y.1975, 389 F.Supp. 964; *Brenneman v. Madigan*, N.D.Calif.1972, 343 F.Supp. 128; *cf. Campbell v. McGruder*, D.D.C. No. 1462–71 (filed Nov. 5, 1975); *see generally* "The Conditions of Pretrial Detention," 79 Yale L.J. 941 (1970).

▇▇ However, even if a sanction, restriction, or condition can be viewed as having a punitive effect on the pretrial detainee, it is constitutional if it also furthers the alternative governmental purpose of maintaining custody, maintaining prison security, or maintaining internal order and discipline within the institution. A pretrial detainee constitutionally need not and, as a practical matter, cannot be provided with a normal civilian life while incarcerated awaiting trial. Before being held as a pretrial detainee, the individual has been arrested on probable cause and the judiciary has determined that there exists a prima facie case against him. Moreover, since the detainee was not released on his own recognizance, the requirement of bail indicates a concern for whether the pretrial detainee will appear at his trial and/or his probable dangerousness to the community. Hence, the pretrial detainee is lawfully imprisoned. Thus, while there are differences in the rights enjoyed by pretrial detainees as opposed to convicted prisoners, lawful imprisonment by its nature requires a dilution of the rights and privileges normally enjoyed by the general public outside the prison walls. *See Pell v. Procunier*, 1974, 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495; *Wolff v. McDonnell*, 1974, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935; *Price v. Johnston*, 1948, 334 U.S. 266, 68 S.Ct. 1049, 92 L.Ed. 1356; *Main Road v. Aytch*, 3 Cir. 1975, 522 F.2d 1080, 1085–1086; *United States ex rel. Tyrell v. Speaker*, 3 Cir. 1973, 471 F.2d 1197, 1201; *Gray v. Creamer*, 3 Cir. 1972, 465 F.2d 179, 183.

▇▇ The court holds that the prison rules set forth in the Handbook For Inmates (defendants' Exhibit No. 3) can be constitutionally applied to pretrial detainees as well as to convicted prisoners because all the regulations contained therein further the penal interests of institutional security and internal order and discipline or are restrictions or privations which inhere in confinement itself which are justified by the necessities of jail administration. Since the rules set forth in the handbook further these interests, the rules are not impermissibly restrictive with respect to pretrial detainees simply because they may be viewed as also having a punitive effect.[6]

---

**6.** To illustrate, regulations pertaining to the screening, including the reading, of incoming and outgoing non-legal mail is constitutional, and censorship of such mail is permissible to the extent the censorship furthers the penal interest of maintenance of institutional securi-

Any restriction on one's freedom of action and any intrusion on one's privacy may be viewed as punitive. Yet loss of freedom of choice and loss of privacy are inherent incidents of imprisonment, whether the inmate is awaiting trial or has been convicted. The court holds that pretrial detainees at the York County Prison are not subject to unconstitutional restrictions.[7]

■ The court rejects the contention that convicted prisoners have a constitutional right to receive meaningful rehabilitative treatment. The failure of prison authorities to afford inmates rehabilitative programs does not constitute cruel and unusual punishment. *Smith v. Schneckloth,* 9 Cir. 1969, 414 F.2d 680; *Wilson v. Kelley,* N.D.Ga.1968, 294 F.Supp. 1005, aff'd 393 U.S. 266; *Holt v. Sarver,* E.D.Ark.1970, 309 F.Supp. 362, aff'd 8 Cir. 1971, 442 F.2d 304; *Smith v. Swenson,* W.D.Mo.1971, 333 F.Supp. 1258; *United States v. Wyandotte County, Kansas,* D.Kan.1972, 343 F.Supp. 1189. There is no constitutional duty imposed on a governmental entity to rehabilitate prisoners. This is especially true with respect to a county prison where a high percentage of the inmates are pretrial detainees who have no need for rehabilitation programs, where the sentenced prisoners are serving relatively short terms, and where there is a constant turnover in the prison population. Under such circumstances, rehabilitation programs may not be worth the effort and expense.

Indeed, whether penal institutions should undertake to rehabilitate prisoners at all—in view of the serious questions that exist with respect to the effectiveness of rehabilitation programs—is a social policy question which should be resolved by the representative branches of government—i. e., the legislative and executive branches—and not by the courts. In *O'Connor v. Donaldson,* 1975, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396, the Supreme Court held that a state hospital's involuntary custodial confinement, without treatment, of a mental patient *who was not dangerous to himself or others* violates the patient's constitutional right to liberty. By contrast, convicted prisoners have been lawfully deprived of their liberty after an adjudication of guilt and they are incarcerated primarily for punitive purposes—i. e., for retribution and deterrence—and in order to remove, at least temporarily, individuals from the general community who constitute a threat to the public welfare. Whether rehabilitation should also be a penal goal is a matter for the public to decide and a question with respect to which the Constitution is silent. As stated by the court in *Novak v. Beto,* 5 Cir. 1971, 453 F.2d 661, 670–671:

> "Our role as judges is not to determine which of these treatments is more rehabilitative than another, or

---

ty, preservation of internal order and discipline, or rehabilitation of the prisoner, these penal interests outweighing first amendment rights. *Procunier v. Martinez,* 1974, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224; *McCleary v. Kelly,* M.D.Pa.1974, 376 F.Supp. 1186. The reading, screening, and censorship of inmate mail can be viewed in effect as "punitive." Nevertheless, the mail of pretrial detainees may be read, screened, and censored to further the penal goals of prison security and internal order and discipline even though this inflicts a loss of privacy on the pretrial detainee and restricts to a certain degree the material which he can receive or send.

**7.** Some courts have found the cruel and unusual punishment prohibition of the eighth amendment directly applicable to pretrial detainees. *See, e. g., Johnson v. Lark,* E.D.Mo. 1973, 365 F.Supp. 289, 301–303; *Collins v. Schoonfield,* D.Md.1972, 344 F.Supp. 257, 264–265; *Jones v. Wittenberg,* N.D.Ohio 1971, 323 F.Supp. 93, 99–100. Other courts have indicated that the cruel and unusual punishment clause is not applicable at all until after conviction and sentence. *Johnson v. Glick,* 2 Cir. 1973, 481 F.2d 1028, 1032, *cert. denied,* 1973, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 32; *Rhem v. Malcolm,* 2 Cir. 1974, 507 F.2d 333. These cases have held that a pretrial detainee is protected from cruel and unusual punishment by the due process clause and equal protection clause. Thus, while the theoretical approach may differ depending on whether one applies the cruel and unusual punishment clause of the due process and equal protection clauses, the results reached are the same.

which is more effective than another. The Constitution does not answer such questions. The scope of our review is very limited under the cruel and unusual punishment clause. And there are good reasons for the limitations on the scope of that review. In the first place we simply are not qualified to answer the many difficult medical, psychological, sociological, and correctional questions when it comes to choosing between one form of treatment and another. It is for this reason, we think, that courts have traditionally confined their review of prison regulations to such standards as 'barbarous' and 'shocking to the conscience.' *See Church v. Hegstrom,* 2d Cir. 1969, 416 F.2d 449. *See also Royal v. Clark,* 5th Cir. 1971, 447 F.2d 501 ('Federal courts will not interfere in the administration of prisons absent an abuse of the wide discretion allowed prison officials in maintaining order and discipline, . . . ')· . . . "

■■■ Plaintiffs attack the adequacy of the law library at the York County Prison, which consists solely of a few volumes of Purdon's Pennsylvania Statutes Annotated. Due process requires that prisoners be afforded access to the courts in order to challenge unlawful convictions and to seek redress for violations of their constitutional rights. *Procunier v. Martinez,* 1974, 416 U.S. 396, 419–422, 94 S.Ct. 1800, 40 L.Ed.2d 224; *Wolff v. McDonnell,* 1974, 418 U.S. 539, 577–580, 94 S.Ct. 2963, 41 L.Ed.2d 935; *Johnson v. Avery,* 1969, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718; *Cruz v. Hauck,* 5 Cir. 1975, 515 F.2d 322; *Guglie v. Ulibarri,* 9 Cir. 1974, 507 F.2d 721. "Access to the courts" encompasses all the means an inmate requires to get a fair hearing from the judiciary on the charges brought against him or grievances alleged by him. In the absence of some alternative provision to ensure that prisoners have the assistance necessary to file petitions and complaints, such as access to legal advice, state officials must provide indigent inmates with access to a reasonably adequate law library for preparation of legal actions. *Gilmore v. Lynch,* N.D.Calif.1970, 319 F.Supp. 105, *aff'd sub nom., Younger v. Gilmore,* 1971, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142; *Cruz v. Hauck,* supra; *Kirby v. Ciccone,* 8 Cir. 1974, 491 F.2d 1310; *Noorlander v. Ciccone,* 8 Cir. 1973, 489 F.2d 642; *Mead v. Parker,* 9 Cir. 1972, 464 F.2d 1108, 1113.

■■ Inmates at the York County Prison do not have adequate access to the courts through means other than by access to legal material, and a prison law library is virtually nonexistent. Therefore, the York County Prison authorities are directed to submit within sixty days a plan that will guarantee inmates effective access to the courts, either by reasonable access to attorneys, by reasonable access to legal material, or by any other reasonable means that can be devised. There are several alternatives available to achieve this goal: (1) establish a legal services program at the prison, perhaps in conjunction with county legal services, whereby inmates upon request are provided with counsel when they desire to file habeas corpus petitions or civil rights actions; (2) establish and maintain an adequate law library at the county prison;[8] (3) devise a plan whereby inmates have limited access to legal material in the county law library, perhaps through establishment of a legal clinic within the prison; (4) make arrangements with the state to transfer inmates desiring access to legal material to a state correctional institution that

---

**8.** An adequate prison law library must contain: United States Supreme Court Reports beginning with Volume 340; the Federal Reporter Second beginning with Volume 340; the Federal Supplement beginning with Volume 235; United States Code Annotated Titles 5, 18, 28, 42, United States Constitution, and the general index; Volume 28 of the Code of Federal Reg-

ulations; Purdon's Titles, 12, 17, 18, 19, 42, 46, 60–61, 71, Pennsylvania Constitution, and general index; Title 37 of the Pennsylvania Code; Pennsylvania Supreme Court Reports beginning with Volume 366; Pennsylvania Superior Court Reports beginning with Volume 165. *Cf. Gaglie v. Ulibarri,* 9 Cir. 1974, 507 F.2d 721.

has an adequate law library. The York County Prison authorities shall submit a plan, in accordance with the guidelines set forth herein, to the court within sixty days setting forth the manner in which they will guarantee effective access to the courts for county inmates.

The court now turns to the issue of whether the York County Prison is in violation of the state minimum requirements for county jails embodied in 37 Pa.Code §§ 95.221–95.248 (adopted April 6, 1973). These standards, which were promulgated by the Pennsylvania Bureau of Correction, are divided into minimum requirements and recommended guidelines. The consent decree requires the county prison to meet only the minimum standards. The recommended guidelines, which are not binding in general on county prisons, are not binding on the York County Prison under the agreement set forth in the consent decree. This was the understanding of the parties at the time the consent decree was entered into and it was with this understanding that this court approved the consent decree in May 1973.

■ The court finds that the defendants are in full compliance with the minimum requirements pertaining to: Personnel set forth in 37 Pa.Code § 95.221(a); Admission set forth in 37 Pa. Code § 95.222(a); Orientation set forth in 37 Pa.Code § 95.223; Rules and regulations set forth in 37 Pa.Code § 95.224; Classification set forth in 37 Pa.Code § 95.225(a), (b); Housing set forth in 37 Pa.Code § 95.226(b)(2), (3), (4); Housing for juveniles set forth in 37 Pa.Code § 95.227; Clothing set forth in 37 Pa. Code § 95.228(a), (b); Bedding set forth in 37 Pa.Code § 95.229(a); Food services set forth in 37 Pa.Code § 95.230(a); Personal hygiene set forth in 37 Pa.Code § 95.231; Medical and health services set forth in 37 Pa.Code § 95.232(a); Visiting set forth in 37 Pa.Code § 95.233(a)(1), (3), (4), (5), (6), (7), (8); Correspondence set forth in 37 Pa.Code § 95.234(a); Work programs set forth in 37 Pa.Code § 95.235(a); Library set forth in 37 Pa.Code § 95.236(a); Religion set forth in 37 Pa. Code § 95.237(a); Recreation set forth in 37 Pa.Code § 95.238; Commissary set forth in 37 Pa.Code § 95.239; Discipline and punishment set forth in 37 Pa.Code § 95.240(a); Security set forth in 37 Pa. Code § 95.241(a)(1)(ii), (iii), (iv), (v), (vi), (vii), (viii), (ix), (2), (3), (4), (5), (6), (7), (8), (9); Extraordinary occurrences reports set forth in 37 Pa.Code § 95.242; Treatment services set forth in 37 Pa. Code § 95.243(a); Investigations of deaths set forth in 37 Pa.Code § 95.246; Notification set forth in 37 Pa.Code § 95.247; Sanitation and safety set forth in 37 Pa.Code § 95.248(1), (2), (3). As these findings indicate, the York County Prison is in substantial compliance with the state minimum standards. However, the court finds that the prison is in violation of four of the minimum requirements—37 Pa.Code §§ 95.233(a)(2), 95.226(a), (b)(1), 95.241(a)(1)(i), and 95.248(4) —and that corrective action, as set forth *infra,* must be undertaken by the defendants.

First, in violation of 37 Pa.Code § 95.233(a)(2), inmates who are guilty of misconducts and placed on the segregation tier are denied their ordinary visitation rights. The minimum standards state that prisoners shall not be denied visits as punishment unless the reason for the denial is due to a serious violation of the visiting rules or there is an obvious security threat. The defendants are directed to comply with this proscription.

Second, in violation of 37 Pa.Code § 95.226(a), (b)(1), inmates at the York County Prison are not properly housed because of overcrowded conditions. The county prison has three floors which contain cells. Each floor is divided into four tiers, with a doorway between each tier. Each tier has a row of seven cells. There are 28 cells on each floor. Thus, the prison has 84 habitable cells. Each cell has approximately 56 square feet of space and is equipped with two bunks, mattresses, fire-resistant mattress covers, fire-resistant pillows, pillow covers, blankets, a toilet and a wash basin. The population of the prison fluctuates between 140 and 190. For example, in

May 1975, the daily average was 172, with the highest day in May being 184 and the lowest 157. By comparison, in April 1975 the daily population average was 147, the highest day being 162 and the lowest 139. With a total of 84 habitable cells, each cell ordinarily houses two inmates, which the cell is equipped to do. However, since a maximum of 168 inmates can be housed in cells, when the population exceeds 168, as it often does, inmates are housed on cots in the walkways outside the cells.[9] Thus, it is apparent that the prison is greatly overcrowded.

This overcrowding makes it impossible for the prison administrators to provide proper housing for all the inmates and also makes it impossible to house prisoners in groups according to their classification. The overcrowded conditions also create a security risk, particularly for the guards who have to pass through the walkway in which inmates are housed on cots.

The present overcrowded conditions at the York County Prison are hazardous and unlawful. To remedy this situation the county prison authorities within ninety days shall reduce the inmate population to a point at which all prisoners are incarcerated in a cell, with no more than two persons per cell. In cases where in an extreme emergency the protection of the public demands immediate confinement of a large number of persons, this limit on jail population may be exceeded for a period of not more than forty-eight hours. In addition, within ninety days of the date of this memorandum and order, the York County Prison authorities shall achieve the following at the York County Prison:

1. Segregate from the general population habitual criminals—i. e., those who have three or more convictions, 37 Pa. Code § 95.226(b)(iii);

2. Segregate from the general population prisoners who are mentally weak,

37 Pa.Code § 95.226(b)(ii), and those who are in poor health or suffering from any disease, 37 Pa.Code § 95.226(b)(i);

3. Establish an inmate housing system in which pretrial detainees and convicted prisoners are not housed in the same cell, and to the extent possible, in which pretrial detainees are housed in different tiers than convicted prisoners.

Third, it is clear that the York County Prison does not employ the required number of correctional officers. The testimony established that there were eight officers on the day shift, seven on the evening shift, four on the middle shift, and eight on the swing shift. Therefore, 27 correctional officers are employed at the county prison. 37 Pa. Code § 95.241(a)(1)(i) provides that the minimum custody ratio is one officer per shift for 15 inmates, with the right of the prison administrator to schedule his officers as he sees fit. Assuming an inmate population of 168, the maximum which the prison can now hold consistent with the court's holding *supra* that all inmates must be incarcerated in cells with no more than two per cell, the county prison must employ a minimum of 33 full-time correctional officers in order to comply with 37 Pa.Code § 95.-241(a)(1)(i). Therefore, the York County Prison authorities shall employ within 120 days the additional correctional officers needed to meet the state minimum of 33. Failure to do so will result in the court fixing a lower number of inmates, commensurate with the number of correctional officers employed, which can be incarcerated at the county prison. For example, with only 27 correctional officers, the prison can lawfully incarcerate a maximum of 135 inmates.

 Finally, there is a serious question as to whether the prison is in compliance with safety standards and fire regulations promulgated by the Pennsylvania Department of Labor and Industry, as required by 37 Pa.Code § 95.-

---

9. Given the needs of jail administration, such as the need to utilize certain tiers to segregate certain classes of prisoners, e. g., juveniles, and the need to incarcerate some inmates in single cells, the county prison often has to house inmates on cots in the walkways outside the cells even though the prison population is less than 168.

248(4). The regulations in question were promulgated under the Fire and Panic Act, 35 P.S. § 1221 et seq. Defendants assert that the Fire and Panic Act, which was enacted in 1927, does not apply to a building such as the York County Prison which was constructed in 1905, before the enactment of the statute. The language of the Act makes this contention untenable. 35 P.S. § 1224 states in pertinent part:

" . . . Where the department finds, after proper investigation, that, *in buildings erected prior to the passage of this act,* the internal ways of egress herein provided for cannot be installed, it may direct that such means of egress be provided as will, in its judgment, to better advantage carry out the intent and purpose of this section. The Department of Labor and Industry may order fire walls, smoke barriers, additional fireproofing, or the enclosure of vertical openings, *to be built in buildings already erected,* or which may hereafter be erected, where in its judgment the erection of such fire walls, smoke barriers, additional fireproofing, or the enclosure or vertical openings is necessary to the reasonable safe protection of the occupants. The ways of egress shall be free from obstruction, lighted, and ready for instant use at all times. Fire escapes, now in use or hereafter erected, shall be painted at least once a year, and be kept in safe condition, and up to such standard requirements as may be specified by the Department of Labor and Industry. The means of egress for special purpose buildings shall be approved by the Department of Labor and Industry. . . . " (Emphasis supplied.)

Section 1221 of the Fire and Panic Act, 35 P.S. § 1221, provides in relevant part:

" . . . Whenever any building designated in this act *shall,* in the opinion of the Department of Labor and Industry, *become dangerous to further occupancy because of structural or other defects,* it shall immediately be closed to further occupancy, and a sign posted thereon to that effect. Such building shall not again be occupied until all recommendations of the department to eliminate hazardous conditions are complied with." (Emphasis supplied.)

The foregoing statutory language makes clear that structures built before the passage of the Act are subject to the Act and to the regulations promulgated thereunder.

■■■■ Defendants contend that application of the Fire and Panic Act to the county prison would contravene Article I, § 9 of the Constitution which forbids *ex post facto* laws. An *ex post facto* law is penal legislation which imposes criminal punishment for conduct lawful previous to its enactment or inflicts greater criminal punishment than the law annexed to the crime when committed. *Harisiades v. Shaughnessy,* 1952, 342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586; *Samuels v. McCardy,* 1925, 267 U.S. 188, 45 S.Ct. 264, 69 L.Ed. 568; *Calder v. Bull,* 1798, 3 U.S. (3 Dall.) 385, 390, 1 L.Ed. 648; *United States v. Bell,* E.D. Tex.1973, 371 F.Supp. 220. While the Fire and Panic Act does provide for imposition of penal sanctions for those who violate the provisions of the Act, 35 P.S. § 1233, the case *sub judice* does not involve in any way these penal sanctions. The sole issue before this court is whether the York County Prison is in violation of the regulations promulgated by the Department of Labor and Industry pursuant to the Fire and Panic Act, and if so, what corrective action must be taken by the county prison authorities. There is no attempt to impose criminal sanctions on any of the defendants. Whether the constitutional prohibition on *ex post facto* laws would prohibit imposition of the penal sanctions on those responsible for a violation of the Act is an issue that is not before this court in this action and hence will have to await future adjudication in an appropriate case. Assuming arguendo that any attempt to impose the criminal penalty set forth in the Act would violate the *ex post facto* clause, the *ex post facto* prohibition only

applies to *penal* sanctions and would not prevent application of non-penal remedies, such as ordering changes made to bring a building into compliance with the Act and the regulations promulgated thereunder.

Defendants also argue that application of the Fire and Panic Act to buildings constructed before its enactment is violative of due process limitations on retrospective legislation. Retroactive legislation which undermines the expectations of individuals who have acted in reliance upon the law existing at the time of their conduct has presented serious constitutional questions, with the courts usually weighing the considerations favoring and opposing retroactive application to determine the reasonableness of a particular enactment. *See Lichter v. United States,* 1948, 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694; *Chicago & Alton Railroad Co. v. Tranbarger,* 1915, 238 U.S. 67, 35 S.Ct. 678, 59 L.Ed. 204; *Look v. Hughes Tool Company,* D.N.H. 1973, 367 F.Supp. 1003; *United States v. Perry,* 9 Cir. 1970, 431 F.2d 1020; *see generally* Greenblatt, Judicial Limitations on Retroactive Civil Litigation, 51 Nw.U.L.Rev. (1956); Note, Retroactive Expansion of State Court Jurisdiction Over Persons, 63 Col.L.Rev. 1105 (1963); Note, Judicial Treatment of Retrospective Legislation, 44 Yale L.J. 358 (1934). However, at least one court, citing *Satterlee v. Matthewson,* 1829, 27 U.S. 380, 412–413 (2 Pet. 380), 7 L.Ed. 458, has held that a retroactive law which does not impair the obligation of contract is constitutional. *Roy v. Jones,* W.D.Pa.1972, 349 F.Supp. 315, *aff'd on other grounds,* 3 Cir. 1973, 484 F.2d 96.

■ This court ought not to resolve the constitutional issue of retroactivity at this time since it will arise only if the building is ordered closed on the ground it violates the Fire and Panic Act, thereby divesting the county of its existing facility. If, however, the Department of Labor and Industry simply requires reasonable modification of existing conditions, clearly there has been no impermissible retroactive application of the statute. The consent decree entered into by the parties and approved by the court did not contemplate closing the county prison. The consent decree was directed primarily at improving the mode of operation of the prison and the treatment of prisoners and was only indirectly concerned with the physical structure itself. However, the last section of the state minimum standards, 37 Pa.Code § 95.-248(4), with which the defendants agreed to comply, requires that all county jails shall follow regulations set forth by the Department of Labor and Industry with respect to fire and safety.

The Pennsylvania Department of Labor and Industry presently is investigating the conditions at York County Prison to determine if the prison is in violation of state fire and safety regulations, and if so, what corrective action is needed.[10] This court will not adjudicate at the present time the question of whether the York County Prison is in violation of the state's fire and safety regulations. Rather the court will postpone a ruling on this issue until the Pennsylvania Department of Labor and Industry has completed its investigation and made its determination on this matter.

■ The court's decision to refrain from adjudicating at the present time the state fire and safety issues is grounded on considerations of comity, *cf. Huffman v. Pursue,* 1975, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482, and on the primary jurisdiction doctrine which allows a court confronted with problems within an agency's area of specialization to delay its adjudication in order to take into account what the agency has to offer with respect to the solution of the problem. *See Far East Conference v. United States,* 1952, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576; *Quigley v. Exxon Company U.S.A.,* M.D.Pa.1974, 376

---

**10.** It is not clear from the record when this investigation began, although apparently it was after the consent decree was entered into but before the motion for enforcement thereof was filed.

F.Supp. 342, 354–356. For this court to adjudicate at this time the issue of whether the county prison is in violation of *state* fire and safety regulations would constitute unwarranted direct intervention by a federal court in an ongoing state civil proceeding. Moreover, under the primary jurisdiction doctrine, the courts have referred matters for an initial determination to a federal administrative agency for resolution when technical or policy considerations within an agency's particular field of expertise are involved. *Far East Conference v. United States, supra; MCI Communications Corp. v. American Telephone & Telegraph Co.,* 3 Cir. 1974, 496 F.2d 214; *Quigley v. Exxon Company U.S.A., supra.* The doctrine is court-made with the principal criterion in deciding whether the doctrine is applicable being judicial appraisal of the need or lack of need for resort to administrative judgment. *See Texas & Pacific Railway Co. v. Abilene Cotton Oil Co.,* 1907, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553; *Quigley v. Exxon Company U.S.A., supra.*

■ Thus, this court holds that a federal court which must adjudicate *state* matters within a *state* agency's field of expertise may utilize the primary jurisdiction doctrine to defer adjudication until the state administrative agency has made a designated determination. In the instant case, the claims grounded on the Fire and Panic Act and regulations promulgated thereunder by the Pennsylvania Department of Labor and Industry certainly raise issues within the Department's area of specialization, and a court should have the benefit of the agency's views on the matter before attempting a resolution.

Therefore, the court directs the plaintiffs and the defendants to attempt to reach a joint resolution of the fire and safety issue in conjunction with the Pennsylvania Department of Labor and Industry. If the parties and the Department cannot agree as to what corrective action, if any, need be taken in order for the York County Prison to be in compliance with the state's fire and safety regulations, the Department and the parties shall each submit their findings and conclusions with respect to the fire and safety regulations and a statement of what corrective action, if any, need be taken in order to achieve compliance. The agreement or the separate reports shall be submitted to the court within thirty days after the Pennsylvania Department of Labor and Industry has concluded its investigation of the prison and made its final determination on the matter. If the Department and the parties resolve the matter, there will be no need for further action by this court. If the Department and the parties do not reach an agreement, the court on the basis of the material filed by the Department and the parties—with additional hearings if necessary—will then decide the matter. At that time the court will also decide any constitutional claims that might arise from any attempt to divest the county of the use of its prison building.

■ Plaintiffs assert that the defendants are in violation of the express provisions for visitation set forth in the consent decree itself. Specifically, plaintiffs contend that county inmates often are not permitted visitation of at least ninety minutes per week. Defendants in effect admit this is so but explain that overcrowded conditions at the prison and the shortage of correctional officers make it impossible some weeks to guarantee each inmate ninety minutes visitation. Having agreed in the consent decree to guarantee each inmate the opportunity for ninety minutes of visitation per week, the York County defendants must do exactly that. Defendants are directed to immediately take whatever steps are necessary to achieve this goal, including the hiring of more correctional personnel and/or expansion of the visiting area.

With the exception of the violations heretofore noted, the court finds that the defendants are in compliance with the consent decree.

■ The court has directed the defendants to undertake corrective ac-

tion to remedy violations of constitutional rights and of the consent decree which it has found to exist. Plaintiffs urge the court to order the county to build a new prison or to order complete renovation of the present facility. The court rejects this request for two reasons. First, the evidence does not support the contention that conditions at the county prison are such that the present facility must be replaced. Second, a federal court lacks the power to order the public or a governmental entity which represents the public—in this case the county commissioners—to expend funds to build new facilities. *Detainees of the Brooklyn House of Detention for Men v. Malcolm,* 2 Cir. 1975, 520 F.2d 392. It is not for the courts to decide how funds available for public expenditure ought to be spent. That is a decision for the representative branches of government which are responsive to the public will. As stated by the court in *Jones v. Wittenberg,* N.D. Ohio 1971, 330 F.Supp. 707, 712–713:

"The popular, and simplistic, idea is that the important source of the problems is the purely physical one, and that this is easily remedied. In other words, build a new jail, and everything will be neatly straightened out. There are two things wrong with this idea.

"The first, and most important, thing wrong is that the evidence clearly demonstrates that if a beautiful brand new jail were built, and operated the way the present jail is operated, there would be little improvement in the difficulties at first, and what improvement there was would very rapidly disappear.

"The second thing wrong is that in order to build a new jail, the public must provide additional funds. This Court has no power whatsoever to require the public to do so. *Under our system of government, the ultimate source of power is the people. The people have not given this Court any taxing power, or any control over their use of the taxing power.* . . . Be that as it may, this Court will not attempt to exercise a power that it does not and should not have. There are strong reasons for thinking that a new jail should be built, and that in the long run substantial economies both in money and in lives could be effected by doing so. However, until a majority of the voters of Lucas County become convinced of this, there will be no new county jail." (Emphasis supplied.)

While this court lacks the power to order public funds expended to build a new prison, the court does have the power to order the release of persons held under conditions which deprive them of rights guaranteed by the Constitution unless the conditions are corrected within a reasonable time. *Detainees of the Brooklyn House of Detention for Men v. Malcolm,* 520 F.2d at 399. Also, this court has the power to enforce the consent decree which the parties entered into.

█ In order to determine whether the parties are in compliance with the consent decree, the court has adjudicated matters of penal administration with which federal courts ordinarily will not concern themselves and which, in the absence of a consent decree, would not be cognizable in a federal civil rights action. While the court in this case because of the consent decree has had to concern itself with practically all aspects of prison administration, this court has done so reluctantly in view of the fact that prison authorities, rather than the judiciary, are better equipped to deal with the problems inherent in the administration of a penal system. Because of the complex and intractable nature of the task confronting prison officials and because of the character of the relationship between the state and the federal government, the federal courts should be reluctant to interfere in matters regarding the internal administration of state and local correctional institutions. While federal courts will take action to protect the constitutional rights of inmates, the traditional policy of judicial restraint with respect to matters of penal administration has not been abandoned. *See Main Road v. Aytch,* 3 Cir. 1975, 522

F.2d 1080. The task of determining the rights and deprivations of state prisoners falls principally upon the prison authorities, whose judgment in the exercise of this important responsibility the federal courts will not ordinarily question. *Gray v. Creamer*, 3 Cir. 1972, 465 F.2d 179. A wide latitude in anticipating the probable consequences of allowing certain conduct or practices in a prison environment is essential to the proper discharge of the prison administrator's duty. *See Procunier v. Martinez*, 1974, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224; *Poe v. Werner*, M.D.Pa.1974, 386 F.Supp. 1014. Prison reform is a matter for the political branches of government, not for the courts. As stated by the Supreme Court in *Procunier v. Martinez*, 1974, 416 U.S. 396, 404–406, 94 S.Ct. 1800, 1807:

"Traditionally, federal courts have adopted a broad hands-off attitude toward problems of prison administration. In part this policy is the product of various limitations on the scope of federal review of conditions in state penal institutions. More fundamentally, this attitude springs from complementary perceptions about the nature of the problems and the efficacy of judicial intervention. Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. *Suffice it to say that the problems of prisons*

*in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.* Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities.

"But a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution. When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights. *Johnson v. Avery*, 393 U.S. 483, 486 [89 S.Ct. 747, 21 L.Ed.2d 718] (1969). . . ." (Footnotes omitted.) (Emphasis supplied.)

Finally, defendants contend that the court cannot enforce the consent decree against the York County Prison Board because its membership consists in part of the judges of the York County Court of Common Pleas, as required by 61 P.S. § 408.[11]

▮▮▮ The doctrine of judicial immunity protects judges from liability for damages in civil rights suits for acts

---

11. "§ 408. Board of inspectors, counties of third to sixth classes; composition; powers and duties; sheriff's responsibility

That the persons now holding the following offices, and their successors, in all counties of this Commonwealth of the third, fourth, and fifth classes, shall compose a board, to be known by the name and style of inspectors of the jail or county prisons, to wit: The judges of the court of common pleas, the district attorney, the sheriff, the controller, and the commissioners of each of said counties; in which board, and the officers appointed by it, the safe-keeping, discipline, and employment of prisoners, and the government and management of said institution, shall be exclusively vested; and that the present responsibility of the sheriff of each of said counties in regard to the safe-keeping of the prisoners shall cease and determine on their committal to said prison, ·and such sheriff shall no longer be furnished a residence in said institution.

Any county of the sixth class may elect by resolution of the county commissioners to be governed by the provisions of this act."

committed within their judicial jurisdiction. *Pierson v. Ray*, 1967, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288; *Bradley v. Fisher*, 1871, 80 U.S. (13 Wall.) 335, 20 L.Ed. 646; *Bauers v. Heisel*, 3 Cir. 1966, 361 F.2d 581; *Clark v. Zimmerman*, M.D. Pa.1975, 394 F.Supp. 1166, 1175–1176. Damages, however, are not sought in the case *sub judice*. A federal court also lacks the power to compel action by a state court, *In re Wolenski*, 3 Cir. 1963, 324 F.2d 309, *cert. denied*, 1964, 377 U.S. 1005, 84 S.Ct. 1941, 12 L.Ed.2d 1053. In the performance of their duties on the prison board, the county judges are not acting within the scope of their *judicial* jurisdiction. They are not involved in a judicial function and they are not exercising judicial power. Rather the county judges are administrators performing an executive function—to wit, the government and management of the county penal institution, a non-judicial duty imposed on them by 61 P.S. § 408 et seq. Therefore, in performing their duties on the county prison board, the judges are not clothed with judicial immunity and the proscription on a federal court compelling action by a state court is inapplicable. Thus, this court has the power to order the county prison board to implement the consent decree in the manner that has been set forth herein and, if necessary, to impose sanctions for failure to do so.

The foregoing shall constitute the court's findings of fact and conclusions of law.

An appropriate order to effectuate the changes needed to bring the York County Prison into compliance with the Constitution and the consent decree will be entered.