**Aharon RON, Petitioner,**

v.

**Andrew J. LENNANE et al.,
Respondents.**

**Civ. No. B–77–363.**

United States District Court.
D. Connecticut.

Dec. 22, 1977.

David Flynn, Law Student Intern, and Judith Resnik, Jerome N. Franke Resnik, Legal Services Org., New Haven, Conn., for petitioner.

Frank Santoro, Asst. U. S. Atty., New Haven, Conn., for respondents.

## MEMORANDUM OF DECISION

DALY, District Judge.

The central and most important of the morning prayers recited by Orthodox Jews—the Amidah—should begin at sunrise. For Orthodox Yemenite Jews, among whom the petitioner places himself, these morning prayers normally continue for more than one hour. All must be spoken audibly, and without interruption. Prayers must also be said in the afternoon and evening. In order for the petitioner to conform to this religious practice, he must rise before dawn, leave the dormitory to avoid disturbing sleeping inmates, and begin his prayers in the seclusion of the television room. The morning head-count at the Danbury Federal Correctional Institution often occurs during the petitioner's prayers. Because of the importance attributed to the head-count in maintaining institutional se-

curity, the defendants on at least one occasion have prevented the petitioner from completing his prayers. As a result of this interference and related conduct, the petitioner claims that the prison officials violated his rights under the First, Fifth, and Eighth Amendments to the Constitution. On the basis of the testimony and exhibits provided at an expedited hearing, this Court holds that the petitioner has failed to prove even a single constitutional violation.

■■ The First Amendment guarantees the free exercise of an individual's religious beliefs, even within prison walls, as long as the exercise is "not inconsistent with this status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). In analyzing whether the First Amendment has been violated, the Court must first discern from the evidence whether the petitioner has established the requisite constitutional interest. First, the petitioner must prove that the conduct prohibited by the prison authorities is "deeply rooted in religious doctrine." *Moskowitz v. Wilkinson*, 432 F.Supp. 947, 949–50 (D.Conn. 1977); *Kahane v. Carlson*, 527 F.2d 492, 495 (2d Cir. 1975); *Teterud v. Burns*, 522 F.2d 357, 360 (8th Cir. 1975). Second, the petitioner must prove that his conduct is the product of a sincere, personal religious belief. *Id.* at 360–61; *Theriault v. Carlson*, 495 F.2d 390, 394–95 (5th Cir.), *cert. denied*, 419 U.S. 1003, 95 S.Ct. 323, 42 L.Ed.2d 279 (1974), *remanded sub nom., Theriault v. Silber*, 391 F.Supp. 578 (W.D.Tex.1975); *Moskowitz v. Wilkinson, supra* at 951 & n.13; *cf. United States v. Seeger*, 380 U.S. 163, 185, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965).

■ Petitioner has clearly met his burden of proof on the first element of the test. The thrice-daily prayers and, in particular, the recitation of the Amidah at sunrise are traditional and highly praiseworthy religious practices. However, the petitioner has failed to convince this Court that his regular devotions are the product of a sincerely held religious belief. Petitioner's testimony was incredible, both in speech and demeanor. Although the border between genuine mannerism and theatrical display is sometimes obscure, the petitioner's explanation of his religious faith, in so far as it related to the practices in question, was contrived. The Court's conclusion as to the petitioner's credibility, initially formed during the hearing, was later corroborated by an examination of the documentary evidence submitted by the Government, evidence of a criminal past that included successful schemes to defraud charitable Jewish Americans.

By recalling the petitioner's criminal record, this Court does not mean to imply that those with a shameful past are beyond reform. Indeed, the loneliness of imprisonment has been known to alter significantly an inmate's religious outlook. *See, e. g.*, C. Colson, Born Again (1976). But that is not the case here. Furthermore, to find a good-faith religious belief in this case would be to reduce that element of the First Amendment analysis to insignificance. And merely requiring a petitioner to prove that his disruptive conduct conforms to traditional religious practice would dangerously inflate the number of First Amendment claims. In so far as the established borders of prison religious practices protected by the First Amendment are based upon the expected frequency of such conduct, *see, e. g., Kahane v. Carlson, supra* at 495, the final result might well be a narrower definition of protected conduct. Therefore a careful determination of the petitioner's good faith in conforming to religious practice is essential to the proper workings of the First Amendment in the prison context. Accordingly, this Court finds that the petitioner does not possess the bona fide religious belief necessary to trigger First Amendment protection.

■ Petitioner's second constitutional claim is that the prison officials violated his right to due process by confining him in administrative segregation even though he presented no threat to the prison guards. Prison regulations provide that an inmate may be placed in administrative detention only if his "continued presence in the gener-

al population poses a serious threat to life, property, himself, staff, other inmates or to the *security of the institution.*" Bureau of Prisons Policy Statement 7400.5D(11)(a)(1) (July 5, 1975) (emphasis added). The petitioner is fifty-one years old, a bit more than five-feet tall, and weighs about 115 pounds. Because the petitioner's stature is not so great as to engender fear in prison personnel, the petitioner argues that there was no justification for detention. But the regulatory preconditions for administrative detention are not limited to imminent physical violence. The petitioner refused to stop praying when ordered to do so, had to be led out of the television room in which he was praying, and refused to remove his religious garments as ordered before entering detention. The petitioner's conduct thus constituted passive resistance to prison authority. The suggestive impact upon other prisoners, along with the redirection of the guards' attention away from the group to a particular inmate, certainly makes the supervision of inmates more difficult, and thus presents a serious threat to the orderly maintenance of institutional security. Therefore the placing of the petitioner in administrative detention did not violate due process.

Finally, the petitioner claims that he was the victim of cruel and unusual punishment in violation of the Eighth Amendment. Petitioner alleges brutality by prison staff and the denial of necessary medical care. Neither claim has any basis in fact. According to testimony that this Court found credible, the prison guards did not use force beyond a simple tap on the shoulder or a nudge on the arm. In addition, the medical care was conscientious, and far exceeded the constitutional minimum. *Compare Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) ("deliberate indifference to serious medical needs" constitutes cruel and unusual punishment), *and Todaro v. Ward*, 565 F.2d 48 (2d Cir. 1977) (pattern of arbitrariness and gross misadministration). Therefore this Court finds that the petitioner's Eighth Amendment claim, as well as his claims under the First and Fifth Amendments, are without merit.

The petition is denied.