Antonio PABON, Pablo Martinez, and Jose Burgos, Individually and on behalf of all others similarly situated

v.

Charles P. McINTOSH, Julius T. Cuyler, Daniel Sims, Larry Rees, Nathan Lewis, Lawrence LaRose, Commonwealth of Pennsylvania.

Civ. A. No. 76–4008.

United States District Court, E. D. Pennsylvania.

Sept. 16, 1982.

**1331**

Robert G. Hanna, Jr., Marshall, Dennehy & Warner, Philadelphia, Pa., for plaintiffs.

Robert P. Kane, Atty. Gen., Michael von Moschzisker, Deputy Atty. Gen., Philadelphia, Pa., for defendants.

## MEMORANDUM and ORDER

SHAPIRO, District Judge.

## I. INTRODUCTION

Named plaintiffs, Antonio Pabon, Pablo Martinez and Jose Burgos, inmates at the Pennsylvania State Correctional Institution at Graterford ("Graterford"), bring this action on behalf of themselves and all others similarly situated against the Commonwealth of Pennsylvania and various state[1] and prison[2] officials. Plaintiffs charge that their constitutional and civil rights were violated by some or all of the defendants. First, plaintiffs complain of certain defendants' refusal to allow a Catholic religious celebration on Three Kings Day as well as a banquet during National Puerto Rican Week.

Second, plaintiffs assert that the Graterford Educational Program deprives Spanish speaking inmates of their rights because the various courses are taught only in English.

Before us are plaintiffs' motion for class certification and cross-motions for summary judgment.[3] For the reasons which follow, plaintiffs' motion for class certification will be granted in part, plaintiffs' motion for summary judgment will be denied and defendants' motions for summary judgment will be granted.

## II. CLASS ACTION CERTIFICATION

Plaintiffs move for class certification under Fed.R.Civ.P. 23(b)(2) of a class defined as "all Spanish speaking prisoners in the Graterford Prison." (Paper No. 37). Defendants oppose the motion as untimely and on the ground that the criteria mandated by Rule 23 have not been met.

### A. Timeliness of Certification Motion

■ Although plaintiffs did not move for class certification within the time period stated by Local Rule 27(c),[4] this failure alone does not compel denial of plaintiffs'

---

1. Charles McIntosh, Secretary of the Budget of the Commonwealth of Pennsylvania.

2. Julius T. Cuyler, Superintendent of Graterford; Daniel Sims, Deputy Superintendent of Graterford; Larry Rees, School Director or Superintendent in charge of Graterford Prison Educational Program; Nathan Lewis, Educational Director at Graterford; and Lawrence LaRose, Vocational Program Director at Graterford.

3. Defendant McIntosh filed a motion to dismiss separate from that of defendants Commonwealth, Cuyler, Sims and Lewis.
   Proper service on defendants LaRose and Rees, by September 30, 1978, was ordered by

Judge Huyett on September 13, 1978 on pain of dismissal for lack of prosecution. Said service not appearing of record, the action against LaRose and Rees is dismissed with prejudice for lack of prosecution. *See, Roadway Express, Inc. v. Piper,* 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980); *Link v. Wabash Railroad Co.,* 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962).

4. The original complaint was filed on January 4, 1976. Plaintiffs' motion for class certification was filed on March 22, 1978. Local Rule 27(c) requires a certification motion within ninety (90) days of the commencement of the action.

motion. *See, Umbriac v. American Snacks, Inc.,* 388 F.Supp. 265 (E.D.Pa.1975) (failure to file class motion within time limits of Local Rule was a *"de minimis* lapse"); *Lee v. North Penn Transfer,* 15 F.R.Serv.2d 1405, 1406 (E.D.Pa.1972) (failure to comply with time limits of local rule not necessarily fatal to class action). The substantive pleading requirements for class action, *see,* Local Rule 27(b), were complied with in the Second Amended Complaint. In this civil rights action, where there was considerable initial confusion regarding the identity of plaintiffs' counsel and where court-appointed counsel filed a second amended complaint, we decline to deny plaintiffs' motion as untimely.

### B. *Fed.R.Civ.P. 23*

Rule 23(a) provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

The prerequisites of Rule 23(a) are mandatory. *Alexander v. Gino's, Inc.,* 621 F.2d 71 (3d Cir.) (*per curiam*), *cert. denied,* 449 U.S. 953, 101 S.Ct. 358, 66 L.Ed.2d 217 (1980).

■ With regard to the banquet issue, an intra-class conflict appears. The standard of fair and adequate representation requires (a) that plaintiffs have no interests antagonistic to those of the class; and (b) that plaintiffs' attorney is capable. *Wetzel v. Liberty Mutual Life Insurance Co.,* 508 F.2d 239, 247 (3d Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975). There is no question that plaintiffs are represented by an experienced and able court-appointed attorney.

But plaintiffs seek to represent all Spanish speaking prisoners. Spanish speaking prisoners are a recognized group that prison regulations allow one banquet per year. Although plaintiffs term the Three Kings Day celebration a religious observance, prison authorities consider it a banquet if in addition to community or religious leaders individual guests of prisoners are to be invited. Plaintiffs assert a federal right to participate in both a Three Kings Day Catholic religious observance with individual guests and a Puerto Rican Week banquet with individual guests.

There is a potential conflict within the proposed class between Catholic and non-Catholic Hispanic prisoners if in fact only one banquet per year is permissible. A sub-class of Catholic, Hispanic prisoners and another for their non-Catholic, Puerto Rican counterparts will not do for two reasons. First, the celebrants of National Puerto Rican Week may be either Catholic or non-Catholic, so an intra-sub-class conflict would still exist. Similarly, a Puerto Rican/non-Puerto Rican sub-class split will not suffice for Three Kings Day observers cross lines of national origin. Second, the sub-class of non-Catholic Puerto Rican prisoners would lack proper representation for each named plaintiff is a Catholic Puerto Rican. Accordingly, as intra-class conflict appears unavoidable, we decline to certify any class on this issue.

■ With regard to prison courses taught only in English, plaintiffs' class definition is overbroad; Spanish speaking prisoners who speak and write English are not harmed by the suspect conduct. The class must be redefined to consist of those Spanish speaking prisoners at Graterford who cannot communicate effectively in English. As to this class, only named plaintiff Burgos has the requisite standing. Pabon and Martinez speak English and indeed have taken courses in that language. (Pabon deposition; Martinez deposition). They do not have "a sufficient stake in an otherwise justiciable controversy to obtain a judicial resolution of that controversy," *Sierra Club v. Morton,* 405 U.S. 727, 731, 92 S.Ct. 1361,

1364, 31 L.Ed.2d 636 (1972); see *Bronze Shields, Inc. v. New Jersey Department of Civil Service,* 667 F.2d 1074, 1079 n.7 (3d Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 3510, 73 L.Ed.2d 1384 (1982). Unless plaintiffs have a cause of action in their own right, they cannot be certified as representatives of a class. *Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). However, plaintiff Burgos who speaks only Spanish (Burgos deposition at 73) has standing to complain of courses taught only in English and he may represent this class. With this class in mind, we consider the other standards of Rule 23(a).

■ The numerosity test is one of practicability of joinder. Impracticability is a subjective determination based on number, expediency and inconvenience of trying individual suits. *Piel v. National Semiconductor Corp.,* 86 F.R.D. 357 (E.D.Pa.1980); Wright and Miller, 7 *Federal Practice and Procedure* § 1762 (1972).

■ The number of Hispanic prisoners is between 40 and 50 of whom between 30 and 40 cannot communicate effectively in English (Lewis deposition at 26; Pabon deposition at 46). Joinder of those 30 to 40 inmates would be impractical. *See also,* Newberg, 1 *Class Actions,* § 1105(g) at 177 (1977) (transient nature of class sometimes makes joinder impractical without regard to the number of persons already injured). We also consider relevant the difficulties and burdens imposed on the prisoners and the court by requiring joinder of individual actions. *See,* Newberg, *supra,* § 1105(f) at 176.

■ A broad based allegation of civil rights violations typically presents common questions of law and fact. Nonetheless, we must pay careful attention to the prerequisites of Rule 23(a). *East Texas Motor Freight, Inc. v. Rodriguez,* 431 U.S. 395, 405, 97 S.Ct. 1891, 1897, 52 L.Ed.2d 453 (1977); *Gurmankin v. Constanzo,* 626 F.2d 1132, 1135 (3d Cir. 1980). Plaintiffs here allege that the uni-lingual curriculum violates various constitutional amendments. These allegations present a common fact pattern and plaintiffs seek the same remedies on the basis of the same legal theories. The factual and legal stance of all members of the class is identical. The common question standard is satisfied.

The typicality standard requires that the class representative be part of the class and possess the same interest and suffer the same injury as the class members. *East Texas Motor Freight, supra* 431 U.S. at 403, 97 S.Ct. at 1896; *see generally, Bartelson, supra* at 667–673. The factual and legal position of the class and its representative are identical. We do not find that the named plaintiff's claim is based on unique circumstances or legal theories which will receive disproportionate emphasis as compared with proposed class members. *See,* 7 Wright and Miller, *supra,* at § 1764; *Alexander, supra.* Where, as here, interests coincide, typicality is satisfied. *Scott v. University of Delaware,* 601 F.2d 76 (3d Cir.), *cert. denied,* 444 U.S. 931, 100 S.Ct. 275, 62 L.Ed.2d 189 (1979).

Finally, plaintiffs seek certification pursuant to Fed.R.Civ.P. 23(b)(2) which states:

> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole. . . .

Plaintiff's allegations, if proven, are actionable for reasons applicable to the entire class. The suspect actions of prison officials are defended on grounds such as financial considerations, which are generally applicable to the class. Plaintiff seeks an injunction requiring prison courses to be taught in Spanish. Class-wide injunctive relief would be appropriate relief with regard to prison-wide policies and procedures. An equitable remedy directed at such practices would benefit the entire class. Accordingly, we shall certify a class consisting of the Graterford Spanish speaking prison-

ers who cannot communicate effectively in English.

## III. MOTIONS FOR SUMMARY JUDGMENT

### A. *The Three Kings Day Celebration*

Plaintiffs' fourth, fifth, and sixth causes of action asserted against defendants Cuyler, Sims, and the Commonwealth of Pennsylvania charge: (1) refusal to allow a Three Kings Day Celebration as well as a banquet during National Puerto Rican Week deprived plaintiffs of unspecified "rights, privileges and/or immunities secured by the federal constitution" in violation of 42 U.S.C. § 1983;[5] (2) such refusal also constituted a violation of 42 U.S.C. §§ 1985 and 1986[6] and (3) refusal to allow the Three Kings Day religious celebration constituted a violation of plaintiffs' First Amendment rights actionable under 42 U.S.C. § 1983 or alternatively directly under the Fourteenth Amendment.

Plaintiffs allege that Three Kings Day, a Catholic holiday, is celebrated by Spanish members of the prison community at a Three Kings Day Catholic Mass on January 7 and that this celebration is "ordinarily done in conjunction with family and official members of the religious community." (Complaint ¶ 16). The celebration, as conducted "on the outside" involves "prayers, dinner and our relatives." (Pabon deposition at 15). Three Kings Day is "our Christmas . . . [i]n Puerto Rico . . . ." (Pabon deposition at 14). Hispanic prisoners requested the opportunity to hold such a traditional celebration, including a dinner with relatives, and that request was denied by Superintendent Cuyler. (Pabon deposition at 16–17). The request was made on December 11, 1976 for a celebration to be held January 6, 9, or 19, 1977. All named plaintiffs, in their answers to interrogatories, aver without more that the denial was for "political reasons." (Plaintiffs' Interrogatory Answers, Papers No. 27–29, ¶ 31).

Plaintiffs, on behalf of the Spanish speaking prisoners, also requested permission on July 14, 1976 for a banquet to be held during National Puerto Rican week in the month of September. (Pabon deposition at 39–40). Permission was denied. Other prisoner organizations, including the

---

**5.** 42 U.S.C. § 1983 provides in pertinent part:

*Civil action for deprivation of rights*

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

**6.** Only the third paragraph of § 1985 conceivably applies to this action; 42 U.S.C. § 1985(3) provides in pertinent part:

*Depriving persons of rights or privileges*

(3) If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all per-

sons within such State or Territory the equal protection of the laws . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1986 provides in pertinent part:

*Action for neglect to prevent*

Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented . . . .

Jaycees and the Nation of Islam, have been permitted to hold banquets. (Pabon deposition at 21).

■ The free exercise of religion is a right enjoyed by state prisoners under the First and Fourteenth Amendments. *Cooper v. Pate,* 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964) (*per curiam*); *Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (*per curiam*). Federal courts sit to enforce the constitutional rights of all "persons," including prisoners. *Id.* at 321, 92 S.Ct. at 1081. We assume, *arguendo,* that the conduct at issue, a Three Kings Day observance with individual guests, is rooted in religious doctrine and demanded in this case on the basis of sincere, personal religious beliefs. *See, Ron v. Lennane,* 445 F.Supp. 98 (D.Conn.1977).[7]

■ Nonetheless, the fact of confinement as well as the legitimate goals and policies of the prison limit the retained constitutional rights of prisoners. *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Mutual accommodation between constitutional provisions and institutional functions is our task. *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). These institutional functions include: (1) deterrence of crime; (2) "quarantining" offenders; (3) rehabilitation; and, central to all other correctional goals, (4) security within the prison. *Pell v. Procunier,* 417 U.S. 817, 823, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). This accommodation formula applies to free exercise of religion cases. *St. Claire v. Cuyler,* 634 F.2d 109 (3d Cir. 1980), *rehearing denied,* 643 F.2d 109 (3d Cir. 1981).

Plaintiffs' claims are based on quite specific proposed conduct. No broad based denial of the right to worship is alleged. *See e.g., Cruz v. Beto, supra* (Buddhist inmate denied right to use prison chapel). Rights to worship on particular holidays, *see, Kauffman v. Johnson,* 454 F.2d 264 (3d Cir. 1972) (*per curiam*), or to have access to clergy, *see O'Malley v. Brierley,* 477 F.2d 785 (3d Cir. 1973), have not been denied. Defendants Cuyler and Sims submitted uncontradicted affidavits that aver that one-full time Catholic priest was available to perform all the religious observances of Catholic prisoners and would officiate if any Catholic sub-group of the prison population had a special religious event they wished to celebrate. (Sims Affidavit, Paper No. 35, Exhibit IV). A Spanish speaking Chaplain also serves the Spanish speaking prison community. (Cuyler Interrogatory ¶ 23, Paper No. 25).

■ Rather, plaintiffs seek to participate in both a Three Kings Day celebration *as they define it, i.e.,* with individual guests, and a National Puerto Rican Week banquet within the same calendar year. Prison policy permits one banquet, defined as a function at which prisoners' guests may attend, per calendar year per inmate group. Banquets are limited in number and disfavored because, unlike inmate "religious observances," attendance at which is limited to community or religious leaders, individual guests present security risks in terms of weapons, drugs and other contraband.[8] It is uncontradicted on the record that plaintiffs may celebrate Three Kings Day without individual guests *and* that they may

---

7. Plaintiffs do not assert that a dinner with friends or relatives is a mandatory Catholic ritual in the proper observance of Three Kings Day. *See generally, The Religious Rights of the Incarcerated,* 125 Pa.L.Rev. 812, 823 (1977) (mandatory diet on religious grounds). Rather, it is alleged merely that a traditional celebration "on the outside" includes these things. (Pabon deposition at 15).

8. The uncontradicted affidavits of defendants Cuyler and Sims in pertinent part provide:
\* \* \* \* \* \*

5. The Spanish speaking inmates groups is [sic] an institutionally recognized group and are pursuant to our guidelines, entitled to banquets....
\* \* \* \* \* \*

7. A 'religious observance' is related to a religious/cultural event. The inmates cannot invite individual guests but rather the group invites any religious/community leaders it wishes. There is no limit to the number of religious observances a group can have in a year.

have a National Puerto Rican Week banquet with guests *or* that they may have a Three Kings Day banquet with guests to the exclusion of a National Puerto Rican Week banquet. By prison policy, plaintiffs cannot have a Three Kings Day banquet with individual invited guests and also have a National Puerto Rican Week banquet with individually invited guests in the same year.

Regarding the Three Kings Day celebration, then, the issue is whether the penological goal of internal security as manifested in the one banquet per calendar year rule is overridden by the plaintiffs' free exercise right. The Third Circuit has provided a standard for prisoner free exercise cases:

We therefore conclude that the state needs only to produce evidence that to permit the exercise of first amendment rights would create a potential danger to institutional security. This evidence may consist of expert testimony from the responsible officials, provided they testify to opinions that are 'held "sincerely" and [are] arguably correct.' ... In determining whether the state has met its burden of production, the court must be mindful of the Supreme Court's instruc-

tion that restrictions on first amendment rights may be deemed valid when prison officials, in the exercise of their informed discretion, conclude that there is a potential danger to security, even though the same showing might be unimpressive if submitted to justify restrictions upon members of the general public.... Once the state has met its burden of going forward with the evidence, the courts must defer to the expert judgment of the prison officials unless the prisoner proves by 'substantial evidence ... that the officials have exaggerated their response' to security considerations, ... or that their beliefs are unreasonable.... (Footnote and citations omitted).

*St. Claire, supra* at 114–15. Here, defendants Cuyler and Sims have enumerated by affidavit the security risks (including smuggling contraband to prisoners) involved when outsiders attend prison functions. Plaintiffs have come forward with *no* evidence to suggest that this concern is exaggerated and indeed have not addressed the security problem at all. Plaintiffs assert that defendants cannot label a religious celebration a "banquet" in order to deny it because the regulations permit only one banquet per year. Yet whether this event

8. A 'banquet' can be for any reason. Each member of the group may invite two guests. There are no qualifications for the guests other than that they be over 18 years of age and not former/current inmates. No group may have more than one banquet in each calendar year.

9. Attachment 'I' is the informal criteria for a group being given permission to have a banquet. It has never been formally adopted but is the one followed at SCIG [State Correctional Institution at Graterford]. All institution advisors are aware of the general procedures and each recognized group has an advisor.

10. A 'religious observance' is the more favored of the two by prison administrators. Such is true because the guests are of such a nature, that the [sic] present little security risk, i.e., are not likely to smuggle in weapons, drugs or other contraband.

11. The administration of SCIG look less favorably upon 'banquets' because there is no control over who the guests are, and therefore, all types of contraband are more likely to be smuggled into the institution.

Further, the number of visitors is greater than for a 'religious observance' and therefore, more guards must be used for security. This strains the staff needed for other purposes and costs the prison excessive amounts of money for overtime pay.

The criteria followed for "banquets" at Graterford provided in part:

1. Banquets are defined as gatherings of inmates, their friends and/or relatives, and community leaders within the institution, with serving of food, entertainment, and ceremony. They are not religious observances, or institution-sponsored events such as the school graduation and sports banquet, or meetings as such with community leaders.

2. Only institutionally authorized inmate groups may request permission for a banquet. A specific proposal must be submitted to the Superintendent at least 60 days in advance, with the rationale for the banquet. External membership must also endorse any banquet proposal.

(Attachment I to Sims Affidavit).

is termed a "banquet" or a "dinner" to which the individual prisoner can invite his own guests and relatives presents the identical security problems for prison officials. Such problems are lessened when the group invites religious or community leaders to attend religious celebrations and there is no limit to the number of these per year.

We hold as a matter of law that the Graterford officials satisfied their burden of production. The one banquet per year per group policy was justified by these officials by reason of internal security. The restriction is reasonably related to a legitimate goal; it is neither "arbitrary or purposeless." *Wolfish, supra* 441 U.S. at 539, 99 S.Ct. at 1874. We must defer to the expertise of the defendants, *Pell, supra;* we cannot say their views are not "arguably correct." *Jones v. North Carolina Prisoners' Labor Union,* 433 U.S. 119, 127, 97 S.Ct. 2532, 2538, 53 L.Ed.2d 629 (1977). Plaintiffs have not satisfied their burden on summary judgment under *St. Claire.* They made no effort to prove the policies unreasonable, exaggerated or insincere. Thus, we cannot find that their free exercise rights were violated. *See, St. Claire, supra* at 116.

■ Plaintiffs also raise an equal protection claim that Black Muslims are granted privileges for religious celebrations which Spanish speaking prisoners are denied. But Muslims, as a recognized inmate group, are allowed one banquet per year just as plaintiffs are.[9] The Muslims may choose to celebrate a religious holiday at their banquet. If plaintiffs prefer to celebrate National Puerto Rican Week by banquet, denying them an additional banquet with relatives on Three Kings Day is not a denial of equal protection. Plaintiffs could choose to have their banquet with outsiders attending on Three Kings Day in connection with the religious observance. It is the claim for a banquet in celebration of Three Kings Day and National Puerto Rican Week that gives rise to the present controversy. Thus, this claim fails.

■ Because no constitutional rights were violated, plaintiffs' § 1985 claim that the defendants conspired to violate such rights also fails. *Kauffman v. Moss,* 420 F.2d 1270 (3d Cir.), *cert. denied,* 400 U.S. 846, 91 S.Ct. 93, 27 L.Ed.2d 84 (1970); *accord, People ex rel. Snead v. Kirkland,* 462 F.Supp. 914, 922 (E.D.Pa.1978). Neither was class-based invidiously discriminatory animus, necessary to state a § 1985(3) claim, averred. *See, Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). Section 1986 violations depend on a pre-existing § 1985 violation. Having failed to state or prove a § 1985 violation, plaintiffs' § 1986 claim necessarily fails. *Rogin v. Bensalem Township,* 616 F.2d 680, 696–97 (3d Cir. 1980), *cert. denied,* 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981).[10]

Whether or not there is a National Puerto Rican Week banquet itself raises no free exercise of religion claim, even though having a National Puerto Rican Week banquet precludes having a Three Kings Day banquet because of the one banquet per year

---

9. Nothing of record indicates that black prisoners comprise more than one group for the purpose of the one banquet per group rule which would result in black prisoners in aggregate receiving more than one banquet per year.

10. We need not reach the issues of absolute immunity of the Commonwealth to suits for money damages, *see, Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 39 L.Ed.2d 358 (1979); *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Skehan v. Board of Trustees of Bloomsburg State College,* 669 F.2d 142 (3d Cir.), *rehearing denied,* 675 F.2d 72 (3d Cir. 1982), or the qualified immunity to damages of these state executive officials. *See, Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978).

Nor need we reach plaintiffs' direct Fourteenth Amendment claim, for plaintiffs stated a claim under § 1983. *See Rogin v. Bensalem Township,* 616 F.2d 680 (3d Cir. 1980), *cert. denied,* 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981); *Mahone v. Waddle,* 564 F.2d 1018 (3d Cir.), *cert. denied sub nom, Pittsburgh v. Mahone,* 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978).

per group regulation. However, plaintiffs raise an equal protection claim concerning the denial of their request for a National Puerto Rican Week banquet.

■ Superintendent Cuyler averred that plaintiffs' banquet request was refused because it was improperly made. (Cuyler Affidavit at ¶ 3) but, on the record herein, this is not correct[11] with regard to the National Puerto Rican Week banquet. The initial request for a September, 1976 banquet was made on July 14, 1976 which met the requirement of 60 days advance notice mandated by prison guidelines proposed on September 9, 1976. (Pabon deposition at 20, 38, 39; Sims Affidavit, Attachment I).[12] Indeed, in Sims' memorandum proposing those guidelines, he stated that a "Latin Prisoner's Rights Organization's" banquet request had been rejected not because of procedural deficiencies but because of "the amount of staff time involved and potential security problems." (Sims Affidavit, Attachment I).

Sims further stated:

> . . . These rejections have been based on the amount of staff time involved and potential security problems. The decision was made that any group having a banquet in the past would be permitted to hold a banquet annually, but other groups would not be permitted to do so. In the long term, I do not see this as an equitable and realistic decision in that it is a 'grandfather clause' situation.

The exclusion of Spanish speaking prisoners from the opportunity to participate in banquets simply because they had not requested banquets in the past is indeed inequita-

ble and, perhaps, irrational.[13] However, we need not reach plaintiffs' equal protection argument because the issue is moot.

It was undisputed that Spanish speaking prisoners, a recognized inmate group, are now entitled to one banquet per year. It was uncontested that the "banquet" request procedures set out, *supra* at n.8, are now followed by Graterford officials. Julio Ruiz, a Spanish speaking teacher at the school, averred that he knew the procedures and was willing to assist prisoners in properly requesting a banquet. (Ruiz Affidavit at ¶¶ 1–7, Paper No. 35.). Plaintiffs have participated in banquets subsequently. (Pabon deposition at 48–49). We find that plaintiffs' present ability to enjoy one banquet per year is the same as that of other recognized inmate groups. Therefore, plaintiffs' prayer for equitable relief on this issue is moot. The complaint did not allege malice or bad faith, and there is no support for the award of punitive damages for which plaintiffs also pray.[14] *See Cochetti v. Desmond*, 572 F.2d 102, 106 (3d Cir. 1978).

## IV. FAILURE TO PROVIDE COURSES IN SPANISH

Plaintiff's first, second, third and fifth causes of action against defendants Cuyler, Lewis, and the Commonwealth of Pennsylvania relate to courses at Graterford taught only in the English language. Plaintiff alleges that Graterford's education program, which includes both academic and vocational courses, is intended to meet the needs of the English speaking prisoners only. (Complaint ¶¶ 14–15). Plaintiff claims this violates a right to be free of

---

11. Cuyler also averred that "economics" precluded sufficient staff supervision to allow an initial banquet at the time requested. (Cuyler Affidavit at ¶ 3).

12. Plaintiffs' request for a Three Kings Day banquet was deficient according to the proposed guidelines. A request for a January 7, 1977 banquet was lodged on December 11, 1976. (Pabon deposition at 40).

13. Exclusions based on chronology rather than suspect classifications would not require strict scrutiny.

14. Defendants' averments that "all my actions in the area of banquets/religious observances were done in good faith and without malice," (Sims Affidavit at ¶ 21; Cuyler Affidavit at ¶ 6) were uncontradicted. There is no need to reach immunity issues. *See,* footnote 10, *supra.*

cruel and unusual punishment, a right to equal protection of the law, and civil rights protected by 42 U.S.C. § 1983, § 1985, and § 1986.[15]

The facts of record are clear and undisputed. The school programs at Graterford include a vocational program, an adult basic education program and a G.E.D. program for attaining a high school equivalency diploma. (Lewis deposition at 18–19). Also offered by the prison is a course entitled "English As A Second Language" ("E.S.L.") for those prisoners whose primary language is Spanish. (Lewis Affidavit ¶ 7, Exhibit IV to Paper No. 51; see, Pabon deposition at 35; Martinez deposition at 61–62; Burgos deposition at 80). Upon the arrival of new prisoners the educational program is described in Spanish for Spanish speaking prisoners. (Lewis deposition at 23–28). English and Spanish notices of course offerings are placed on the bulletin boards in each cell block. (Lewis deposition at 37). A Spanish speaking prisoner can take any class he wishes for which there is an opening; enrollment is determined on a first come, first served basis. He may be told to take E.S.L. by an instructor if his lack of proficiency in English is hurting him in other classes. (Lewis Affidavit ¶¶ 9, 10, 13).

Prisoners who effectively speak only Spanish comprise approximately 3% of the Graterford inmate population.[16] (Lewis deposition at 26). Defendants contend that limited funds are made available by the state for the educational programs and that a full dual language program for the relatively small number of these Spanish speaking prisoners cannot be provided within these budget constraints. (Lewis Affidavit ¶ 6). This statement is uncontradicted.

### A. Cruel and Unusual Punishment

The situation here complained of does not approach punishment which is prohibited by the Eighth Amendment; that is, "punishments which, although not physically barbarous, 'involve the unnecessary and wanton infliction of pain,' . . . or are grossly disproportionate to the severity of the crime . . ." *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (U.S.1981) (citation omitted) (double-celling is not cruel and· unusual punishment). Plaintiffs here seek a bilingual education program. Whatever the merits of that desire, its denial does not constitute a condition of prison life which is cruel or unusual punishment. "The failure of prison authorities to afford inmates rehabilitative programs does not constitute cruel and unusual punishment." *Padgett v. Stein,* 406 F.Supp. 287, 296 (M.D. Pa.1975); *accord Wojtczak v. Cuyler,* 480 F.Supp. 1288, 1303 (E.D.Pa.1979) (denial of employment); *United States ex rel Hoss v. Cuyler,* 452 F.Supp. 256, 283 (E.D.Pa.1978).

Moreover, while rehabilitation is one of the primary functions of the penal system, *Pell, supra* 417 U.S. at 822–23, 94 S.Ct. at 2804, "prison inmates have no constitutional right to rehabilitation programs." *Hluchan v. Fauver,* 480 F.Supp. 103, 108 (D.N.J.1979); *accord Padgett, supra* at 296–297. The failure to provide rehabilitation programs in prison is constitutionally unobjectionable.[17] *See,* J. Gobert and N. Cohen, *Rights of Prisoners* 342–43

---

**15.** Plaintiffs also claim in their third cause of action that they had been denied access to the prison law library. (Complaint at ¶¶ 23, 28). *See, Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *Kershner v. Mazurkiewicz,* 670 F.2d 440 (3d Cir. 1982). This claim was not briefed by plaintiffs and it appears to be moot. (Pabon deposition at 12–13, 43–44).

**16.** The parties differ as to their exact number. Lewis estimates 40–50 individuals (Lewis deposition at 26) and plaintiffs Pabon and Martinez

about 30 individuals (Pabon deposition at 46; Martinez deposition at 67).

**17.** The Supreme Court recently held that mentally retarded persons involuntarily committed to a state institution have due process liberty rights to training and habilitation related to their safety and freedom from undue restraints. *Youngberg v. Romeo,* —— U.S. ——, 102 S.Ct. 2452, 73 L.Ed.2d 28. This case is obviously distinguishable.

(1981) and cases cited therein. We recognize that lack of rehabilitative programs may violate the Eighth Amendment in certain special circumstances in combination with other institutional conditions, *see, e.g., Finney v. Arkansas Board of Corrections,* 505 F.2d 194 (8th Cir. 1974) (rehabilitation programs not generally available, little recreation time and inmates subjected to physical abuse if work fell below arbitrary standards), but on the undisputed facts there are no such circumstances here. As to the Eighth Amendment claim defendants' motion for summary judgment will be granted.

### B. *Equal Protection*

Plaintiffs also claim that offering courses only in English constitutes disparate treatment of prisoners speaking only Spanish who are in effect deprived of various educational and vocational programs in violation of the Fourteenth Amendment.

■ The initial inquiry under an equal protection analysis is the level of scrutiny by which the actions of prison officials are reviewed. Only those classifications which disadvantage a "suspect class" or that impinge upon the exercise of a fundamental right are treated as "presumptively invidious." *Plyler v. Doe,* —— U.S. ——, ——, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786. Such classifications require the state to demonstrate that they have been precisely tailored to serve a compelling governmental interest. *Id.* If classifications do not relate to suspect classes or impinge on fundamental rights, we need seek only the assurance that they bear some fair relationship to a legitimate public purpose. *Id.* We find neither a suspect class nor a fundamental right involved in this case.

■ Discrimination on the basis of national origin involves a suspect classification requiring strict scrutiny in an equal protection analysis. *See, Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954).

However, the facts here do not state such a claim. The disparate treatment complained of depends upon the language spoken by the prisoner. Any non-English speaking prisoner is affected whatever his national origin. By plaintiffs' own estimates as many as 20 of the Spanish prisoners (30–50), including Pabon and Martinez, speak English. Despite the national heritage of these prisoners, the non-availability of Spanish language classes does not affect them adversely.

In *Guadalupe Organization, Inc. v. Tempe Elementary School,* 587 F.2d 1022, 1026 n.3 (9th Cir. 1978), the court, holding that public school students had no Fourteenth Amendment right to a bilingual/bicultural education, stated:

> Appellants make no argument that appellees have made a 'suspect classification' that would necessitate a more stringent analysis. Inasmuch as appellees only differentiate explicitly among students with respect to the provision of remedial English instruction, no such claim is possible.

The same result obtains in this case. There is no suspect class requiring strict scrutiny.

■ No fundamental right is intruded upon by the prison's classification. While a *public school education* generally is a vital civic institution necessary for effective and intelligent participation in our society, *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), it is not a constitutional right. *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *Shaffer v. Board of School Directors,* No. 81–2880, 687 F.2d 718 (3d Cir. filed Aug. 25, 1982). Moreover, students in the *public schools* have no right to a bilingual education on equal protection grounds. *See, Guadalupe Organization, Inc., supra; Keyes v. School District No. 1,* 521 F.2d 465 (10th Cir. 1975), *cert. denied,* 423 U.S. 1066, 96 S.Ct. 806, 46 L.Ed.2d 657 (1976); *Otero v. Mesa County Valley School District,* 408 F.Supp. 162 (D.Colo.1975), *vacated on other grounds,* 568

F.2d 1312 (10th Cir. 1977).[18] As discussed above, prisoners have no constitutional right to rehabilitative programs. Thus, there is simply no basis for extrapolating from the Fourteenth Amendment a constitutional right of prisoners to bilingual education.

In the absence of suspect classification or fundamental right equal protection analysis requires only that a classification which results in unequal treatment bear some rational relationship to a legitimate state purpose. *Plyler, supra.* Prison officials must demonstrate a rational basis for a program of instruction exclusively in the English language except for the E.S.L. course.

Defendant officials demonstrated that the educational program was intended to serve the need of the greatest number of prisoners within the reality of a limited educational budget. Rehabilitation and vocational training of inmates is clearly a legitimate goal of prison officials. The cost of requiring all courses to be taught in both English and Spanish would eliminate many of the courses offered which serve at least 97% of the prison population. While in some contexts the preservation of resources standing alone cannot justify a classification used in allocating those resources, *see e.g., Plyler, supra* —— U.S. at ——, 102 S.Ct. at 2400 (denying free public school education to school age children whose citizen or alien status is undocumented),[19] here defendants seek to educate as many prisoners as possible and no other ulterior or irrational motive is apparent. Spanish speaking prisoners were excluded from no course and offered the E.S.L. course to prepare them for courses taught in English. We conclude that the educational program

bears a rational relationship to a legitimate state purpose and is not in violation of the equal protection requirement of the Fourteenth Amendment. Summary judgment will be entered for defendants upon the Fourteenth Amendment and § 1983 claims.

Because defendants' activities entailed no violation of rights, no conspiracy to violate plaintiffs' rights could be successfully alleged. *Kauffman, supra.* Summary judgment will be entered for defendants upon the § 1985 claim. Because the § 1985 claim is not actionable, neither is plaintiffs' § 1986 claim. *Rogin, supra.*

## V. MOTION TO DISMISS OF CHARLES P. McINTOSH

Defendant McIntosh has moved without opposition to dismiss the second amended Complaint. Although McIntosh is a named defendant in that Complaint, none of the six causes of action plaintiff asserts against named individuals is asserted against McIntosh; even if they were, no liability would exist against McIntosh anyway. Allowing amendment of the twice amended complaint to include allegations against this defendant would serve no purpose. McIntosh has stated by an uncontradicted affidavit (Exhibit I, Paper No. 43) that he has no connection with nor ability to control the events of which plaintiffs complain. Therefore, his motion, treated as one for summary judgment, will be granted.

## VI. PENDENT STATE CLAIMS

Defendants move to dismiss pendent state claims. The only reference to state claims in the second amended Complaint is in paragraph four (4): "[p]endent jurisdiction is involved over any state claims as they arise from the same transaction and

---

18. The Supreme Court has declined to rule upon the equal protection ground for asserting a right to bilingual education in public schools. *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974) (relying upon Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d in disposing of a similar claim).

19. Cf. *Murillo v. Bambrick,* 681 F.2d 898 (3d Cir., 1982) (the need for reimbursement of a portion of the expenses incurred by the State in providing divorce-related services constitutes a rational basis for charging litigants a supplemental divorce fee).

occurrence." But plaintiffs do not aver *any* state claim. No state claims having been stated, no dismissal is necessary.

## ORDER

AND NOW, this 10th day of September, 1982, for the reasons set forth in the accompanying Memorandum, it is ORDERED that:

1. Plaintiffs' motion for class certification is GRANTED in part. On plaintiffs' claims regarding the failure to teach courses in Spanish, a class consisting of Spanish speaking prisoners at the Pennsylvania State Correctional Institution at Graterford who cannot communicate effectively in English is certified. In all other respects certification is DENIED.

2. The motion for summary judgment of defendants Commonwealth, Cuyler, Sims and Lewis is GRANTED and plaintiffs' motion for summary judgment is DENIED.

3. Defendant McIntosh's motion to dismiss, treated as one for summary judgment, is GRANTED.

4. Defendants' motion to dismiss pendent state claims is DENIED AS MOOT.

5. Plaintiffs' claims against defendants LaRose and Rees are DISMISSED with prejudice for lack of prosecution.