Henry T. LITTLE, Plaintiff,

v.

Jack TERHUNE, et al., Defendants.

CIVIL ACTION NO. 99–3165 (MLC).

United States District Court,
D. New Jersey.

Feb. 11, 2002.

## MEMORANDUM OPINION

COOPER, District Judge.

This matter comes before the Court on (1) motion of plaintiff Henry T. Little for partial summary judgment pursuant to Federal Rule of Civil Procedure 56 ("Rule 56") and (2) crossmotion of defendants Jack Terhune ("Terhune"), Roy L. Hendricks ("Hendricks"), and Ronald V. Paice ("Paice") for summary judgment pursuant to Rule 56. For the reasons stated below, we will deny plaintiff's motion, but grant defendants' cross-motion.

### *BACKGROUND*

For more than fifteen years, plaintiff has been incarcerated in the administrative segregation unit at New Jersey State Prison ("NJSP"). (Decl. of Henry T. Little Pursuant to 28 U.S.C. § 1746 at 2.) Plaintiff was sent to administrative segregation for disciplinary reasons. (*Id.*) Plaintiff maintains that in the time he has been confined to administrative segregation, he has not been provided educational opportunities. (Am.Compl.¶ 15.)

In July 1999, plaintiff submitted to the Court a civil complaint and an application to proceed *in forma pauperis.* In August 1999, the Court entered an Opinion granting plaintiff's application. (Op. filed 8–6–99.) Among other things, the Opinion dismissed plaintiff's Eighth Amendment, equal protection, and parole claims pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(i) and 1915A(b)(1), and allowed plaintiff's disciplinary due process claim to proceed. In September 1999, the magistrate judge granted plaintiff's motion for the appointment of counsel pursuant to 28 U.S.C.

§ 1915. (Order filed 9–14–99.) In December 1999, plaintiff, through appointed counsel, filed an Amended Complaint. (Am. Compl. filed 12–8–99.)

The Amended Complaint omitted plaintiff's disciplinary due process claim in favor of seven new causes of action: three causes of action based on the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, three based on the Equal Protection Clauses of the New Jersey Constitution, and one claim based on the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. § 10:5–1 *et seq.* (*Id.*)[1]

Plaintiff's Amended Complaint alleges that inmates, such as he, who are confined to administrative segregation at NJSP do not have access to meaningful educational and employment opportunities, nor the ability to attain an education. (*Id.* ¶ 11.) The Amended Complaint also alleges that other similarly situated inmates, including inmates in the general population at NJSP, inmates in administrative segregation at other New Jersey prisons, and inmates under the age of twenty-one in administrative segregation at NJSP, have access to those opportunities. (*Id.* ¶ 12.)

In December 1999, defendants Terhune, Hendricks, and Paice filed an Answer to the Amended Complaint. Defendants NJSP, New Jersey Department of Corrections, and The State of New Jersey filed an Answer in January 2000.

In September 2000, defendants moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

Plaintiff voluntarily withdrew his claims against NJSP, New Jersey Department of Corrections, and the State of New Jersey, and withdrew his claim under the NJLAD (Count VII) against all defendants. In March 2001, this Court entered a Memorandum and Order granting in part and denying in part defendants' motion for judgment on the pleadings. (Mem. & Order filed 3–30–01.) The Court permitted plaintiff to proceed with equal protection claims against Terhune, Hendricks, and Paice.

In August 2001, plaintiff filed the instant motion for partial summary judgment pursuant to Rule 56, arguing that partial summary judgment should be granted on defendants' liability "because the undisputed material facts demonstrate that they are responsible for denying plaintiff access to educational opportunities offered to others similarly situated without any rational basis to justify the disparate treatment." (Pl.'s Br. in Supp. of Mot. for Partial Summ. J. ("Pl.'s Br.") at 5.) Terhune, Hendricks, and Paice also now cross-move for summary judgment pursuant to Rule 56.

## DISCUSSION

### I. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is enti-

---

1. Specifically, plaintiff claims that he was deprived of his equal protection rights because defendants afforded employment and educational opportunities (1) to inmates confined in administrative segregation at other New Jersey prisons but not at NJSP in violation of the Fourteenth Amendment (Count I) and the New Jersey Constitution (Count II), (2) to inmates in the general population at NJSP but not to inmates in administrative segregation at NJSP in violation of the Fourteenth Amendment (Count III) and the New Jersey Constitution (Count IV), and (3) to inmates under the age of twenty-one at NJSP but not to inmates over the age of twenty-one at NJSP in violation of the Fourteenth Amendment (Count V) and the New Jersey Constitution (Count VI). (*See generally* Am. Compl.)

tled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial burden of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its initial burden, the non-moving party must present evidence that establishes that a genuine issue of material fact exists, making it necessary to resolve the difference at trial. *Id.* at 324, 106 S.Ct. 2548; *Jersey Cent. Power & Light Co. v. Lacey Township,* 772 F.2d 1103, 1109 (3d Cir.1985). A non-moving party may not rely on mere allegations; it must present actual evidence that creates a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The role of the judge at the summary judgment stage is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. "By its very terms, the standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–48, 106 S.Ct. 2505. Material facts are only those facts that might affect the outcome of the action under governing law. *Id.* at 248, 106 S.Ct. 2505; *Boyd v. Ford Motor Co.,* 948 F.2d 283, 285 (6th Cir.1991). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citation omitted).

## II. *Equal Protection*

In order to state a valid civil rights claim under 42 U.S.C. § 1983, a plaintiff must establish that the defendant acted under color of state law to deprive the plaintiff of a right secured by the Federal Constitution or the laws of the United States. *Groman v. Township of Manalapan,* 47 F.3d 628, 633 (3d Cir.1995); *Shaw v. Strackhouse,* 920 F.2d 1135, 1141–42 (3d Cir.1990). There is no question that defendants are, in their personal capacities, amenable to suit under section 1983 because they were conducting themselves as employees of a government agency, the New Jersey Bureau of Prisons, when they allegedly denied educational programs to inmates confined in the administrative segregation unit of NJSP and thus were acting under color of state law. *See, e.g., Annis v. County of Westchester, N.Y.,* 36 F.3d 251, 254 (2d Cir.1994). We will now determine whether there are genuine issues of material fact related to whether defendants have violated plaintiff's equal protection rights.

■■■ "[T]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Vill. of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (quoting *Sioux City Bridge Co. v. Dakota County,* 260 U.S. 441, 445, 43 S.Ct. 190, 67 L.Ed. 340 (1923) (quoting *Sunday Lake Iron Co. v. Township of Wakefield,* 247 U.S. 350, 352,

38 S.Ct. 495, 62 L.Ed. 1154 (1918))); *see also Ingenito v. Dep't of Corr.*, 568 F.Supp. 946, 955 (D.N.J.1983) (holding that equal protection applies to administrative behavior as well as to legislation and regulations). The unlawful administration by state officers of a state statute or regulation, resulting in its unequal application to those who are entitled to be treated alike, can deny equal protection if intentional or purposeful discrimination caused the disparity in treatment. *See Snowden v. Hughes*, 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497 (1944); *see also Esmail v. Macrane*, 53 F.3d 176, 179 (7th Cir.1995) (holding that denial of equal protection may be established where "the power of government is brought to bear on a harmless individual merely because a powerful state or local official harbors malignant animosity toward him"). Purposeful discrimination may appear on the face of the action taken, or it may be shown by extrinsic evidence of a discriminatory design. *Snowden*, 321 U.S. at 8, 64 S.Ct. 397; *see also DeHart v. Horn*, 227 F.3d 47, 61 n. 10 (3d Cir.2000) (opining that intent to discriminate can sometimes be inferred from relative disparity in treatment).

■■■ Plaintiff acknowledges that rational-basis review governs his equal protection challenge.[2] (Pl.'s Br. at 5, 7.) To bring a successful claim under section 1983 for a denial of equal protection under the Fourteenth Amendment when the plaintiff does not allege membership in a suspect class or interference with a fundamental right, a plaintiff must show that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.[3] *See, e.g., Olech*, 528 U.S. at 564, 120 S.Ct. 1073. Although inmates do not have a constitutional right to educational and work programs,[4] once the state grants such rights to prisoners it may not invidiously discriminate against a class of inmates in connection with those programs unless the difference in treatment is rationally related to the legitimate governmental interest used to justify the disparate treatment. *See, e.g., id.*

2. Plaintiff's equal-protection challenge implicates neither a suspect classification nor a fundamental right. Prisoners are not a suspect class. *Myrie v. Comm'r, N.J. Dep't of Corr.*, 267 F.3d 251, 263 (3d Cir.2001); *Abdul–Akbar v. McKelvie*, 239 F.3d 307, 317 (3d Cir.2001); *Artway v. Scheidemantel*, Civ. A. No. 87–2131, 1988 WL 150823, at *2 (D.N.J. Nov.21, 1988). Prisoners possess no fundamental right to rehabilitation programs, educational or otherwise. *Pabon v. McIntosh*, 546 F.Supp. 1328, 1341 (E.D.Pa.1982).

3. Although the New Jersey Constitution lacks a specific equal protection clause analogous to that found in the Fourteenth Amendment of the United States Constitution, Article I, paragraph I of the State Constitution has been held to provide similar equal protection coverage to that of the federal clause. *Peper v. Princeton Univ. Bd. of Trs.*, 77 N.J. 55, 79, 389 A.2d 465, 477 (1978). "Under the rational-basis test of equal protection under both the State Constitution and the Fourteenth Amend-

ment, a [challenged classification] must be upheld if it is rationally related to a legitimate state interest." *N.J. State League of Municipalities v. State*, 257 N.J.Super. 509, 518, 608 A.2d 965, 970 (App.Div.1992). Because the rational-basis tests are the same under the federal and state constitutional schemes, therefore, the Court's analysis and conclusions apply equally to plaintiff's equal protection claims under the Fourteenth Amendment and the New Jersey Constitution.

4. The fact that New Jersey may have granted prisoners access to such programs does not necessarily grant inmates a liberty or property interest in them. *See Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *James v. Quinlan*, 866 F.2d 627, 630 (3d Cir.1989); *Johnson v. Fauver*, 559 F.Supp. 1287, 1290–91 (D.N.J.1983); *Rowe v. Fauver*, 533 F.Supp. 1239, 1242 (D.N.J.1982); *Lorusso v. Pinchak*, 305 N.J.Super. 117, 119, 701 A.2d 974, 975 (App.Div.1997).

■ Therefore, to sustain an equal protection claim, plaintiff must show that he was similarly situated to, and treated differently from, other inmates. *Tillman v. Lebanon County Corr. Facility*, 221 F.3d 410, 424 (3d Cir.2000); *Johnson v. Horn*, 150 F.3d 276, 284 (3d Cir.1998); *Keenan v. City of Phila.*, 983 F.2d 459, 465 (3d Cir. 1992). Plaintiff maintains that he is the victim of invidious discrimination in violation of equal protection because he has been deprived of access to educational programs available to similarly situated inmates (1) in the general population at NJSP, (2) under the age of twenty-one at NJSP, and (3) in administrative segregation at other New Jersey prisons. (Pl.'s Br. at 5, 7.) Plaintiff has the burden of demonstrating that the groups that "are treated differently are so similar to [plaintiff] that there is no rational basis for the distinctions which defendants make, and 'that the discretion of prison officials to treat groups differently has been abused.'" *The Holy Name Soc'y v. Horn*, No. 97–804, 2001 WL 959408, at *13 (E.D.Pa. Aug.21, 2001) (quoting *Madison v. Horn*, No. Civ. A. 97–3143, 1998 WL 531830, at *19 (E.D.Pa. Aug.21, 1998)).

■ In assessing this case, the Court "begins with the guiding principle that courts must show appropriate deference to policy decisions made by prison officials." *Scott v. Horn*, Civ. A. No. 97–1448, 1998 WL 57671, at *8 (E.D.Pa. Feb.9, 1998); *see also Hluchan v. Fauver*, 480 F.Supp. 103, 109 (D.N.J.1979) (stating that "federal courts must pay great deference to the informed discretion of prison officials"). The federal courts' role in prison oversight is necessarily limited because the "complex and intractable" problems of prisons "are not readily susceptible of resolution by decree." *Procunier v. Martinez*, 416 U.S. 396, 404–05, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). The Equal Protection Clause "is not a license for courts to judge the wisdom, fairness, or logic" of a policy choice. *Romer v. Evans*, 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). The "well established policy of judicial deference springs from the related principles of institutional competence, federalism, and separation of powers." *Glover v. Johnson*, 35 F.Supp.2d 1010, 1013 (E.D.Mich.1999). Where, as here, state penal institutions are "involved, federal courts have ... additional reason to accord deference to the appropriate prison authorities." *Turner v. Safley*, 482 U.S. 78, 85, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *see also Preiser v. Rodriguez*, 411 U.S. 475, 491–92, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973) ("It is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of prisons.")

■ Defendants argue that rational bases supporting the disparate treatment of plaintiff are (1) budgetary policy and constraints, (2) institutional security and order, and (3) education policy in the form of a State statutory obligation to provide inmates under twenty-one with educational programming. (Defs.' Br. in Opp'n to Pl.'s Mot. for Summ. J. and in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Br.") at 23.) [5] In examining those bases, the Court is cognizant that whether a posited reason for the challenged distinction actually motivated the State policymaker is "entirely irrelevant for constitutional purposes[.]" *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). A classification under rational-

---

5. Defendants do not contest that plaintiff is similarly situated to the members of the three identified groups, and the Court assumes for purposes of this motion that plaintiff is similarly situated.

basis review "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* at 313, 113 S.Ct. 2096; *see also Heller v. Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). On rational-basis review, a classification carries a presumption of validity, and those attacking the rationality of the classification "have the burden 'to negative every conceivable basis which might support it.'" *Beach Communications, Inc.,* 508 U.S. at 315, 113 S.Ct. 2096 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 364, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973)); *see also N.J. State League of Municipalities,* 257 N.J.Super. at 518, 608 A.2d at 970 (stating that under New Jersey rational-basis review, plaintiff has the burden of demonstrating that challenged classification lacks rational basis and must "refute all possible rational bases for the differing treatment"). A policy choice "is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *Beach Communications, Inc.,* 508 U.S. at 315, 113 S.Ct. 2096. A court may uphold state action creating a classification on any conceivably valid purpose, even when the court itself supplies the hypothetical basis. *Tillman,* 221 F.3d at 423; *see also Malmed v. Thornburgh,* 621 F.2d 565, 576 (3d Cir.1980) (stating that state conduct may be upheld on any valid basis, even one the court hypothetically poses); *Newark Super. Officers Ass'n v. City of Newark,* 98 N.J. 212, 227, 486 A.2d 305, 313 (1985) (stating that under New Jersey rational-basis review, challenged classification must be upheld if court "can conceive of any reason to justify the classification").

Against that backdrop, the Court determines that defendants have advanced legitimate penological objectives justifying the distinctions at issue. "Both security and economic concerns are legitimate penological demands." *Al–Alamin v. Gramley,* 926 F.2d 680, 686 (7th Cir.1991). The maintenance of prison security and order naturally are legitimate penological interests. *See, e.g., O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987); *Wolfe v. Horn,* 130 F.Supp.2d 648, 655 (E.D.Pa.2001); *Madison,* 1998 WL 531830, at *9; *Muhammad v. N.Y. Dep't of Corr.,* 904 F.Supp. 161, 199 (S.D.N.Y.1995). Prison officials "should be accorded wideranging deference in the adoption and execution of policies that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

█ In this case, the disparate availability of educational programming between inmates in the general population at NJSP and inmates in administrative segregation at NJSP is rationally related to overlapping security concerns and budgetary constraints. Administrative segregation is defined as "removal of an inmate from the general population of a correctional facility to a long term close custody unit because of one or more disciplinary infractions." N.J. Admin. Code tit. 10A, § 5–1.3 (2001). Close custody is defined as an "area within a correctional facility designated for assigning inmates who are removed from the general population for disciplinary or administrative reasons." N.J. Admin.Code tit. 10A, § 5–1.3 (2001). The security needs of the administrative-segregation unit are heightened, and inmates in that unit are classified as greater security risks.[6] (Certif. of David M. Rago-

---

**6.** Plaintiff himself explained the purposes of administrative segregation at NJSP:

nese, Esq., dated 9–7–01 ("Ragonese Certif."), Ex. C: Dep. of Ronald V. Paice ("Paice Dep.") at 73–74.)

This case finds parallels in federal precedent. When a prisoner alleged an equal protection violation because a prisoner in protective segregation loses privileges afforded those in the general population, the United States Court of Appeals for the Fourth Circuit rejected that claim, reasoning that the restriction on privileges granted to a prisoner in protective segregation

> is a function of security and order. The rationality of a distinction between privileges for prisoners in the general population and those in protective segregation goes to the fundamental purpose of such segregation. Protective segregation is offered to inmates for their safety, the safety of others in confinement, and to insure institutional security and order. To allow prisoners in protective segregation to enjoy all of the same privileges to the same degree as those in the general population would eviscerate the value of protective segregation. Because the differences in treatment among prisoners in protective segregation and in the general population has a substantial, rational basis in the legitimate state interest of prison security, we hold that [the prisoner's] rights to equal protection have not been abridged.

> To me it's just to keep guys who don't obey the institutional rules, they lock them up to keep them away from other guys thinking that they might be a threat to those who happen to be around him and also to himself. So they keep them locked up until they decide to, you know, change their ways.
>
> (Certif. of David M. Ragonese, Esq., dated 9–7–01, Ex. B. Dep. of Henry Little dated 6–13–01 at 17.)

7. In the Court's Memorandum and Order filed March 30, 2001, we held that plaintiff

*Allgood v. Morris,* 724 F.2d 1098, 1100–01 (4th Cir.1984). The circumstances of this case are similar also to those of *French v. Owens,* in which inmates in protective custody at an Indiana state prison claimed that they did not have equal access to the same vocational, academic, and rehabilitations programs as the general population. 777 F.2d 1250, 1256 (7th Cir.), *cert. denied,* 479 U.S. 817, 107 S.Ct. 77, 93 L.Ed.2d 32 (1986). The court held that security reasons can justify limiting the access of prisoners in protective custody. *Id.; see also Hosna v. Groose,* 80 F.3d 298, 305 (8th Cir.1996) ("Inmates who reside in administrative segregation have been generally identified as either being a particular danger to others, or being in particular danger from others. Because of this, the security needs of this unit are heightened, and every inmate must be construed as a potential threat to every other inmate.")

Further, plaintiff was not deprived of his equal protection rights because inmates in administrative segregation at other correctional facilities may be afforded educational programming.[7] In *Weiss v. Mader,* 525 F.Supp. 834 (E.D.Pa. 1981), a state prisoner brought a civil rights action alleging denial of equal protection in deprivation of access to programs for educational rehabilitation. The court held that the challenged allocation of educational funds for prisoners had a rational basis, stating that

alleged insufficient facts against Hendricks and Paice to withstand dismissal of his claims alleging discrimination compared with inmates in administrative segregation at other correctional facilities. (Mem. & Order filed 3–30–01 at 17–18 (dismissing Counts I and II against Hendricks and Paice).) Therefore, plaintiff's claims on Counts I and II of the Amended Complaint, relating to the educational access of administrative segregation at New Jersey prisons other than NJSP, only apply to defendant Terhune.

prisoner authorities are typically given wide latitude in the internal administration of correctional facilities, and I see no reason in this case to usurp the function of the prison officials in assessing these factors to determine whether a particular educational program is appropriate for a given correctional facility.... The mere fact that there may be variations in educational opportunities throughout the prison system does not mean that the allocation system runs afoul of the equal protection clause.

*Id.* at 839.

Of the fourteen correctional facilities within the New Jersey Department of Corrections, only NJSP is deemed to be "maximum security" (Defs.' Br. at 7.) By definition, NJSP as a maximum-security prison is uniquely situated as an correctional institution. That uniqueness as a maximum-security prison generates for NJSP a distinct set of institutional imperatives, especially related to security. Prison authorities, such as defendant Terhune, could rationally distinguish between the educational programming available to administrative-segregation inmates at a maximum-security prison such as NJSP and the educational programming available to administrative-segregation inmates at non-maximum-security prisons in New Jersey. The fact that administrative-segregation inmates at other New Jersey prisons may have access to educational programming "is rationally related to the legitimate governmental interest in avoiding the possibility of penalizing prisons" for making improvements in the institutional conditions for prisoners. *Waterman v. Farmer*, 84 F.Supp.2d 579, 588 (D.N.J.2000).[8] If absolute uniformity in prison rehabilitation programming within a state's correctional system were to become a constitutional mandate, "prison officials would be far less willing to experiment and innovate with programs at an individual institution knowing that a federal court could impose liability on the basis of a program comparison." *Klinger v. Dep't of Corr.*, 31 F.3d 727, 733 (8th Cir.1994), *cert. denied*, 513 U.S. 1185, 115 S.Ct. 1177, 130 L.Ed.2d 1130 (1995).

Varying arrays of variables affect the programmatic posture of an institution, especially when the institution's underlying correctional context is maximum security. Working within limited-funding strictures, prison administrators "will calibrate programming differently in each prison, emphasizing in one prison programs that they de-emphasize in others." *Id.* at 732. An inter-institutional comparison of educational programming impermissibly "places the burden on prison officials to explain decisions that resulted from the complicated interplay of many variables—some of which were beyond their control—and thus not susceptible to ready explanation." *Id.* Such a comparison "improperly results in federal court scrutiny of prison officials'

---

**8.** The New Jersey administrative regulations state that educational programs "shall be made available" to inmates in administrative segregation who are desirous of participating in such programs. N.J. Admin. Code tit. 10A, § 5–3.14 (2001). The Court can agree that such a regulation might make administrative segregation inmates at NJSP, such as plaintiff, similarly situated to general population inmates and inmates under twentyone in administrative segregation. (*See* Mem. & Order filed 3–30–01 at 8–9; Pl.'s Br. at 10 (arguing that Code section 5–3.14 "puts prisoners in administrative segregation on equal footing with respect to prisoners in the general population and the prisoners who are under the age of 21").) The Court, however, already assumes plaintiff's similar situatedness, and mandatory language in prison regulations is not designed to grant to prisoners entitlements to state-conferred privileges, such as educational programming. *See Sandin*, 515 U.S. at 481–82, 115 S.Ct. 2293.

substantive administrative decisions." *Id.* at 733.

Plaintiff argues that defendants' reliance on budgetary constraints "misses the point" because "defendants violated the plaintiff's equal protection rights by failing to *allocate* the available educational resources in an even-handed manner, not because they did not have enough money." (Pl.'s Reply Br. in Supp. of Pl.'s Mot. for Partial Summ. J. and in Opp'n to Defs.' Cross–Motion for Summ. J. at 1.) Here, however, the allocation of resources has a clear rational basis. Defendants reasonably explain that the reasons for offering programs to general population inmates at NJSP rather than administrative segregation inmates "centered around [the] ability of staff to deliver programs." (Defs.' Br. at 11.) Paice explained a reason for the distinction:

> At New Jersey State Prison there is very limited movement of staff. The inmates in close custody units could not be brought to the school. Therefore, you know, the bigger bang for the buck. In general population inmates could move from their cell block to the school building. 60 to 80 inmates, maybe 100 inmates in the school building at any one time receiving educational programming as compared to two inmates, for example, in a close custody unit receiving educational programming over a two hour period of time, one on one.

(Paice Dep. at 50.) It is hardly irrational to seek the maximization of benefits in the allocation of scarce education resources among the greatest number of inmates within a correctional facility. Officials at NJSP could determine reasonably that the provision of educational programming to administrative segregation inmates would require them to preempt more comprehensive educational opportunities. *Cf. Brian B. ex rel. Lois B. v. Pa. Dep't of Educ.*, 230

F.3d 582, 587 (3d Cir.2000) (discussing how possibility that other services would be preempted might justify policy determination to not institute certain educational programming in correctional facility). Moreover, limiting educational programming to general-population inmates at NJSP is a reasonable response "to budgetary constraints upon available manpower[,]" as NJSP seeks to efficiently allocate staff without compromising security. *See Salaam v. Collins*, 830 F.Supp. 853, 862–63 (D.Md.1993).

A district court relied on similar reasoning in rejecting prisoners' equal protection challenge in *Pabon v. McIntosh*, 546 F.Supp. 1328 (E.D.Pa.1982). There, the plaintiffs claimed that the offering of educational courses only in English constituted disparate treatment of prisoners speaking only Spanish, who in effect were deprived allegedly of various educational and vocational programs in violation of their equal protection rights. *Id.* at 1340. The court denied that claim, reasoning that

> [d]efendant officials demonstrated that the educational program was intended to serve the need of the greatest number of prisoners within the reality of a limited educational budget. Rehabilitation and vocational training of inmates is clearly a legitimate goal of prison officials. The cost of requiring all courses to be taught in both English and Spanish would eliminate many of the courses offered which serve at least 97% of the prison population. While in some contexts the preservation of resources standing alone cannot justify a classification used in allocating those resources, here defendants seek to educate as many prisoners as possible and no ulterior or irrational motive is apparent.

*Id.* at 1341 (citation omitted).

Equal protection is not a vehicle for courts' supplanting the allocational priori-

ties of prison administrators, which effectively is what plaintiff would have this court attempt. "In allocating ... a scarce resource within the prison system, ... [prison officials] must be permitted wide discretion to use that resource in a manner calculated best to effectuate their own reasonable conception of legitimate penological goals." *Salaam,* 830 F.Supp. at 864 (D.Md.1993). When rationing programming "at an individual prison under the restrictions of a limited budget, prison officials must make hard choices. They must balance many considerations, ranging from the characteristics of the inmates at that prison to the size of the institution" to create an optimal configuration of restrictions and privileges. *Klinger,* 31 F.3d at 732; *accord Williams v. Price,* 25 F.Supp.2d 605, 620 (W.D.Pa. 1997). "Prison administrators, like most government officials, have limited resources to provide the services they are called upon to administer[,]" and "it is not the prerogative of the federal courts to micromanage the penal system of a state." *Al–Alamin,* 926 F.2d at 686, 688. "Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Turner,* 482 U.S. at 84–85, 107 S.Ct. 2254; *see also Sandin v. Conner,* 515 U.S. 472, 482, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (stating that "federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment"). This Court shall not engage in the sort of micromanagement of prisons in New Jersey that courts uniformly and properly have eschewed.

■ Plaintiff also argues that no rational basis justifies the disparate treatment at issue because the New Jersey Department of Corrections has a goal of rehabilitating prisoners and plaintiff is among those who need education the most. (Pl.'s Br. at 9.) Plaintiff maintains that defendants' unequal treatment of plaintiff is arbitrary and irrational because rehabilitation is a fundamental goal of prisons and plaintiff "clearly needs and desires to be rehabilitated." (*Id.* at 11.) That plaintiff seeks to effectuate personally the legitimate penological goal of rehabilitation, however, does not establish arbitrariness and irrationality. To state that the Department of Corrections has the goal of rehabilitation simply begs the question. "Prison administrators are responsible ... for rehabilitating, *to the extent that human nature and inadequate resources allow,* the inmates placed in their custody." *Procunier,* 416 U.S. at 404–05, 94 S.Ct. 1800 (emphasis added). That conditional language is apposite here, as the Supreme Court suggests that rehabilitation is not an overriding goal, but rather is a contingent value dependent on scarce resource distribution.

Ultimately, rehabilitation is one of many penological interests, and the "evaluation of penological objectives is committed to the considered judgment of prison administrators, 'who are actually charged with and trained in the running of the particular institution under examination.'" *O'Lone,* 482 U.S. at 349, 107 S.Ct. 2400 (quoting *Bell,* 441 U.S. at 562, 99 S.Ct. 1861). The responsibility for assessing penological factors and "deciding whether any sort of arrangement is appropriate is properly committed to the sound discretion of prison officials." *Jamieson v. Robinson,* 641 F.2d 138, 143 (3d Cir.1981). Further, defendants reasonably argue that depriving administrative segregation inmates of educational programming actually advances the goal of rehabilitation because such deprivation allows for limited resources to be dedicated to a greater per-

centage of the total inmate population of NJSP. Therefore, even accepting plaintiff's posited goal of rehabilitation and his premise that allocation of resources is the issue, we conclude that defendants had a rational basis for their allocation of educational resources and that the allocation rationally advanced that rehabilitation goal.

 Finally, the disparity in educational programming on the basis of age classification among inmates in administrative segregation in NJSP also has a rational basis. Pursuant to the State Facilities Education Act (SFEA), N.J. Stat. Ann. § 18A:7B–1, the State provides funds for educational programs for inmates who are younger than twenty-one years of age. The purpose of SFEA is "to provide a thorough and efficient education for children in all State facilities. It applies to educational programs in State schools and day training centers for the mentally retarded, State psychiatric hospitals, State residential youth centers, and State correctional facilities." N.J. Stat. Ann. § 18A:7B–1. NJSP is required to provide a count of inmates under twenty-one and receives funding to support their education. (Paice Dep. at 29.) Thus, the State imposes on correctional facilities a statutory obligation to provide younger inmates with educational programming and provides the funds to fulfill that mandate.

It cannot be gainsaid that the State acts rationally in requiring and funding the education of children, including childhood offenders housed in prisons. Indeed, childhood education is viewed widely as a fundamental interest of government generally. The Third Circuit recently stated that "a legislature's non-arbitrary judgment about educational priorities is not subject to judicial second-guessing."

*Brian B.*, 230 F.3d at 588. A legislature could have determined that inmates under twenty-one, by virtue of their relative youth, have greater rehabilitative potential and thus would benefit more from educational programming than those inmates twenty-one and older. *Cf. id.* at 587 (describing hypothetical legislative reasoning supporting distinction between certain inmate populations). A legislature reasonably could view education for youthful inmates "as having a higher priority than education generally" for the inmate population. *See id.* For that matter, a legislature could reason pragmatically on the basis of societal self-interest that younger inmates are more likely to gain eventual release, and educational programming for those younger inmates might militate partially against recidivism. "In each case, the necessity of legislative line-drawing 'renders the precise coordinates of the resulting legislative judgment virtually unreviewable, since the legislature must be allowed to approach a perceived problem incrementally.'" *Id.* (quoting *Beach Communications*, 508 U.S. at 316, 113 S.Ct. 2096.) Therefore, the legislature did not act irrationally in maintaining education for inmates under twenty-one, and prison administrators at NJSP acted rationally in fulfilling that mandate from the State.

### *CONCLUSION*

The Court concludes that no genuine issues of material fact exist concerning plaintiff's equal-protection claims and that defendants are entitled to judgment as a matter of law.[9] When the Court examines the evidence in the light most favorable to plaintiff and affords him all reasonable inferences, plaintiff has failed to satisfy his burden to "negate every conceivable justi-

---

**9.** Because the Court concludes that defendants are entitled to summary judgment on the basis of our equal protection analysis, we need not discuss defendants' other grounds for summary judgment. (*See* Defs.' Br. at 14–20, 26–32.)

fication for the classification[s] in order to prove that the classification[s][are] wholly irrational." *Id.* at 586.